CUMBERLAND CAPITAL
CORPORATION,
Plaintiff-Appellant,

v.

Patricia R. HARRIS, Secretary of Housing and Urban Development, and Alan J. Kappeler, in their official capacities, Defendants-Appellees.

CUMBERLAND CAPITAL
CORPORATION,
Petitioner,

v.

OFFICE OF INTERSTATE LAND SALES REGISTRATION, Department of Housing and Urban Development, Respondent.

Nos. 77–1658, 78–3158.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 28, 1980.

Decided May 19, 1980.

James F. Neal, Neal & Harwell, Thomas H. Dundon, Nashville, Tenn., for Cumberland Capital Corp.

Hal D. Hardin, U. S. Atty., Wm. Gary Blackburn, Nashville, Tenn., Samuel B. Rothman, Washington, D. C., for defendants-appellees and respondent.

Before WEICK, BOYCE F. MARTIN, Jr. and JONES, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Plaintiff-appellant Cumberland Capital Corporation is a financial institution with its main office and principal place of business in Nashville, Tennessee. In January, 1976, Cumberland filed a complaint in district court against the Secretary of Housing

and Urban Development and the Acting Director of the Office of Interstate Land Sales Registration (OILSR).

In substance, the complaint alleged that Cumberland is not a "developer"[1] selling lots in a "subdivision"[2] within the meaning of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 *et seq.* (1974 and Cum.Supp.1978); therefore, it claimed, it is not subject to the statute's administrative provisions. On this theory, Cumberland sought declaratory relief from application of the Act. Cumberland also asked the court to enjoin defendants from enforcing an administrative subpoena served on it in December, 1975, for the purpose of obtaining information about Cumberland's real estate activities. The requested injunction would also preclude future agency action against Cumberland. OILSR initially made a tentative determination that Cumberland was subject to the requirements of the Act due to its common promotional plan to sell or lease more than fifty lots. It was found that a thread of common ownership, sales agents, offices, inventory, and advertising constituted such a plan.

The district court found that it lacked jurisdiction over the controversy, dismissed the complaint, and granted the government's motion to enforce a scaled-down version of the administrative subpoena. Cumberland appeals from the dismissal of its complaint and the denial of its motion for summary judgment.

■ Before reaching the substantive issues of this case, we review, briefly, the reasons underlying the district court's lack of jurisdiction. First, the court found that the agency had not, as of September, 1977, made a "final determination" that Cumberland's land sales were subject to the Act. This question was subsequently resolved by letter of March 1, 1978, in which the agency concluded that appellant "was and is a developer, within the meaning of the Act." The government acknowledges the finality of this determination. The issue is now, therefore, ripe for review. *National Automatic Laundry and Cleaning Council v. Shultz*, 443 F.2d 689 (D.C.Cir.1971).

■ Second, the district court was of the opinion that it lacked subject matter jurisdiction over the controversy. Section 1411 of the Act sets out the means of obtaining judicial review of an agency decision. *See Whitney National Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965), and *Memphis Trust Co. v. Board of Governors*, 584 F.2d 921 (6th Cir. 1978). Section 1411 reads, in pertinent part:

Any person, aggrieved by an order or determination of the Secretary issued after a hearing, may obtain a review of such order or determination in the *court of appeals of the United States*, within any circuit wherein such person resides or has his principal place of business, . . by filing in such court, within sixty days after the entry of such order or determination, a written petition praying that the order or determination of the Secretary be modified or be set aside in whole or in part. . . . Upon the filing of such petition, *the jurisdiction of the court shall be exclusive* and its judgment and decree, . . . shall be final. . . .

15 U.S.C. § 1710(a) (emphasis added)[3]. A petition for review was filed and consolidated for consideration with this appeal.[4] This

---

1. The statute defines "developer" as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision . . . ." 15 U.S.C. § 1701(5).

2. "Subdivision" is defined as "any land which is located in any state or in a foreign country and is divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan . . . ." 15 U.S.C. § 1701(3).

3. This jurisdictional provision should not be read to conflict with Section 1420 of the Act, which limits the jurisdiction of the district courts to suits to enforce duties or liabilities created by the Act. 15 U.S.C. § 1719. *See Rockefeller v. High Sky, Inc.*, 394 F.Supp. 303 (E.D.Pa.1975).

4. By order dated August 8, 1978, plaintiffs appeal of the case against Patricia R. Harris, et al., No. 77–1658, was consolidated with the appeal of the final determination of OILSR dated March 1, 1978, Case No. 78–3158.

case is, therefore, properly before us. We turn accordingly, to the substantive issues it presents.

■ We begin our discussion with the Secretary's principal argument that the controversy is moot. The government bases this contention on a proposed "scattered site" exemption and a "no action" letter dated June 6, 1978. This letter stated that the agency would take no further action against Cumberland in light of a proposed regulation which would exempt:

> The sale or lease of lots in a scattered site subdivision if the individual sites have fewer than 50 lots each. A site is a lot or any group of lots that are contiguous or are known or designated by a common name. For purposes of this exemption, lots will be considered contiguous even though physically separated by a road, park, water, recreational or other facility, or in any similar manner.

43 Fed.Reg. 23,947 (1978) [to be codified in 24 C.F.R. § 1710.13(b)(7)]. Since the proposed regulation places Cumberland's immediate dispute with the agency in abeyance, the government argues that neither party has a sufficient legal interest to maintain the litigation.

Cumberland, on the contrary, contends that its continued classification as a "developer" in agency records nevertheless subjects it to a risk of unwarranted regulation under the Act. We agree. If, in the future, appellant's land sales activities should no longer fall within the letter of the scattered site exemption, or if the exemption should cease to apply for any other reason, Cumberland would find itself in the same position it occupied before the exemption was adopted—it would again face administrative regulation and possible civil and criminal sanctions. For example, Title IV of the Housing and Community Development Amendments of 1979 exempts the sale or lease of lots in a subdivision containing less than twenty-five lots. 15 U.S.C. § 1702(a)(1). Also exempted are subdivisions containing twenty-five to one hundred lots unless such number of lots was under-

taken to avoid the requirements of the Act. 15 U.S.C. § 1702(b)(1).[5] Cumberland's dilemma is clearly "capable of repetition, yet evading review." Cumberland need not face the specter of administrative sanctions and costly litigation expenses if its contention that it is not a "developer" under any circumstances, i. e., with or without applicable exemptions, holds true. The case is therefore amenable to adjudication despite the usual definition of a "live" case or controversy. *DeFunis v. Odegaard*, 416 U.S. 312, 319, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974). To resolve appellant's present ambiguous status, we must determine whether or not Cumberland is a "developer" for purposes of the Act.

■ Cumberland's involvement in land sales is an outgrowth of its activities as a lending institution. As security on loans, it occasionally took mortgages or deeds of trust on unimproved real estate. According to company records, loans secured in this manner constitute only a tiny fraction of Cumberland's total business.

The government contends that Cumberland is anything but a de minimus developer: For twenty months between August 1970 and September 1973, 12% of Cumberland's total transactions were secured in whole or in part by real estate, representing 52% of the dollar amount of volume.

On the default of a borrower, the company would foreclose according to the terms of the loan agreement. A trustee would then advertise and conduct a public sale of the security. Cumberland would sometimes purchase the property and offer it for resale. None of these tracts were altered or improved during the period of Cumberland's ownership; neither was the land replatted or subdivided. The record convinces us that Cumberland's involvement in land sales, undertaken only as necessitated by defaulting borrowers, is truly "incidental" in character.

The legislative history of the Interstate Land Sales Full Disclosure Act, passed as Title XIV of the 1968 Housing and Urban

---

5. See P.L. 96–153 which became effective on June 21, 1980.

Development Act, reveals that it was directed at enterprises of another ilk altogether. The Act was prompted by disclosures at Senate hearings of gross abuses by promoters of undeveloped land. *Flint Ridge Development Co. v. Scenic Rivers Assn. of Oklahoma*, 426 U.S. 776, 777, 96 S.Ct. 2430, 2433, 49 L.Ed.2d 205 (1976), and *Husted v. Amrep Corporation*, 429 F.Supp. 298 (S.D.N.Y.1977). The Act is aimed at "get rich quick promoters" who bilked purchasers, particularly the elderly, out of millions of dollars in the early 1960's:

> [M]any people, including our Nation's senior citizens, have purchased property in response to false and misleading promises regarding the nature of the land and the type of community in which it would be located. As a result, they have suffered financial losses, which in many instances amounted to their entire life savings. . . . The proposal of the committee would authorize the Secretary of Housing and Urban Development to require such disclosure. By so doing, the public is protected as is the responsible developer.

Report of the Committee on Banking and Currency, U.S. Senate, Sen.Rep. No. 1123, 90th Congress, 2d Sess. at 109, U.S.Code Cong. & Admin.News 1968, p. 2873. *McCown v. Heidler*, 527 F.2d 204, 207 (10th Cir. 1975), describes the situation the Act is designed to prevent:

> The "developer" of a land sale plan is usually a corporate entity which, in a fraudulent scheme . . ., ends up defunct and offers no reserve for recovery to those persons defrauded; so, too, the end selling agent, when the development collapses financially, is often long gone or cannot respond pecuniarily.

Cumberland denies that it can be characterized as a "developer" selling lots in a "subdivision" pursuant to a "common promotional plan." The Act originally covered transactions involving undeveloped land which was subdivided into 50 or more lots to be sold or leased as part of a common promotional plan. The Housing and Community Development Amendments of 1979 amended the definition of "subdivision" and clarified the term "common promotional plan" as it applies to a subdivision. It can be argued that Cumberland falls within the strict definition of "developer," i. e., "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision." 15 U.S.C. § 1701(5). "Subdivision" now "means any land which is located in any State or in a foreign country and is divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan . . . ." 15 U.S.C. § 1701(3).

These two terms cannot be read alone, however. The crux of the matter revolves around the term "common promotional plan" for which the 1979 amendments inserted the following definition:

> "[C]ommon promotional plan" means a plan, undertaken by a single developer or a group of developers acting in concert, to offer lots for sale or lease; where such land is offered for sale by such a developer or group of developers acting in concert, and such land is contiguous or is known, designated, or advertised as a common unit or by a common name, such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan . . . .

15 U.S.C. § 1701(4). Crucially, the House and Senate conferees did not believe that a common promotional plan exists when the sole connection between two or more parcels of land is that they share a common equity investor. H.R.Rep. No. 96–706, 96th Cong., 1st Sess. 74 (1979), U.S.Code Cong. & Admin.News, pp. 2317, 2402.

Cumberland also notes the statutory provision which exempts the "sale of evidences of indebtedness secured by a mortgage or deed of trust on real estate . . . ," 15 U.S.C. 1702(a)(3), and reasons that an exemption for a dealer in mortgages should, logically, allow him to enforce those instruments without subjecting him to the exten-

sive regulation of the Act. Cumberland's practice of foreclosure, purchase, and resale, as opposed to the sale of defaulted mortgages themselves, merely represents an effort to prevent or minimize losses on its loan transactions.

There is some precedent to support Cumberland's contention that the Act does not apply to lending institutions acting in the normal course of business. *Timmreck v. Munn*, 433 F.Supp. 396 (N.D.Ill.1977); *Bettis v. Lakeland, Inc.*, 402 F.Supp. 1300 (E.D. Tenn.1975); *Zachery v. Treasure Lake of Georgia, Inc.*, 374 F.Supp. 251 (N.D.Ga. 1974); and *Adema v. Great Northern Development Co.*, 374 F.Supp. 318 (N.D.Ga. 1973). Each of these cases turned on the extent of the financing party's participation in the particular project. In *Timmreck, supra*, for example, the defendant bank had held itself out as the financial backer of subdivision developments; its activities clearly exceeded the scope of Cumberland's involvement in the real estate sales business.

In light of the foregoing discussion, we find that Cumberland Capital's activities to date do not fall within the purview of the Interstate Land Sales Full Disclosure Act. The legislative history of the statute, coupled with the occasional and incidental nature of Cumberland's real estate sales militate against its inclusion in the regulatory scheme. Our decision does not, of course, imply that a lending institution can never be properly classified as a "developer" by the defendant agency; we hold only that as long as the present circumstances continue unchanged, Cumberland's "developer" classification is erroneous.

The judgment of the district court is reversed as is the finding of the Office of Interstate Land Sales Registration that Cumberland Capital is a "developer" within the meaning of the Interstate Land Sales Full Disclosure Act.