James R. HAMMAR, et al., Plaintiffs,

v.

**COST CONTROL MARKETING AND SALES MANAGEMENT OF VIRGINIA, INC., et al., Defendants.**

Civ. A. No. 88–0034–C.

United States District Court,
W.D. Virginia,
Charlottesville Division.

Jan. 31, 1990.

F. Bosley Crowther, III, Palmyra, Va., Robert H. Blodinger, Charlottesville, Va., for plaintiffs.

Brien A. Roche, Johnson & Roche, McLean, Va., for Long & Foster Real Estate, Inc.

M.E. Gibson, Christine Thomson, Smith, Taggart, Gibson & Albro, Charlottesville, Va., for Northeastern Bank.

Bradley W. Fitzgerald, John L. Walker, Woods, Rogers & Hazelgrove, Roanoke, Va., for Norman O. Failla.

Jeffrey H. Krasnow, Roanoke, Va., for Hand Crafted Homes, Inc., Preferred Builders of Va. Inc.

Francis T. Eck, Thomas P. Collins, Eck, Lewis, Anderson, & Collins, Richmond, Va., for Cost Control Marketing & Sales, Spectrum Abstract Corp., Monticello Development Corp.

Marshall E. Anders, Rosenblum & Anders, P.C., Stroudsburgh, Pa., for Handcrafted Homes, Inc. & Preferred Builders of Va., Inc.

## MEMORANDUM OPINION

MICHAEL, District Judge.

### I. *Background*

#### A. Introduction.

This case concerns Lake Monticello, a real estate development in Fluvanna County, Virginia. The plaintiffs brought this action pursuant to the Interstate Land Sales Full Disclosure Act [the Act], 15 U.S.C. § 1701 *et seq.* The case comes before the court only under the court's federal question jurisdiction, since the plaintiffs have not pled either diversity jurisdiction or pendent or ancillary jurisdiction with respect to any of the defendants. The complaint centers upon alleged violations of the Act by the defendants. Plaintiffs accuse the defendants, in their various capacities, of violating the Act by, among other things, failing to provide required property reports to purchasers, grossly inflating the price of unimproved lots, failing to give buyers notice of their right to rescind sales contracts, and refusing to rescind within the period prescribed by law. The court notes at the outset that this opinion is based only on the record currently before the court. The court recognizes that much additional discovery will probably ensue.

Oliver Wendell Holmes wrote that a problem in the law often seems like a dragon that looks very large and very threatening. However, Holmes wrote, "if we can just get it out on an open field in the sun and count its teeth, we will be fine." Holmes, *The Common Law,* p. 104 (Cambridge: The Belknap Press, 1963 Edition). The complexity of this case and the often less-than-pristine briefing of some of these motions has made the issues before the court loom as ominously as Holmes' dragon. In the discussion to follow, the court has endeavored to bring this beast into the light. It trusts that by the end of this Opinion, the teeth will have been counted and the case will be ready to proceed.

#### B. Lake Monticello is a Subdivision within the Meaning of the Interstate Land Sales Full Disclosure Act.

■ Section 1701(3) of the Act defines subdivision as "any land which is located in any State … and is divided … into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan." The Act states that a common promotional plan is presumed "where such land is offered for sale by such a developer … and such land is contiguous or is known, designated, or advertised as a common unit or by a common name." 15 U.S.C. § 1701(4). The Lake Monticello lots that are at issue in this suit are extensively advertised as a common unit and by the common names of Lake Monticello and Jefferson Country Model Village World through newspaper advertisements and videotapes arranged by defendant Cost Control Marketing and Sales Management of Virginia, Inc. (CCM–VA). *See, e.g.,* Advertisement Submitted as Attachment One, Plaintiffs' Motion for Summary Judgment. Lake Monticello clearly meets the Act's definition of a subdivision as lots offered for sale as part of a common promotional plan. *See* 15 U.S.C. § 1701(3), (4).

Moreover, as is explained *infra* in the court's discussion of its denial of CCM–VA's motion for summary judgment, the allegedly fraudulent activities at issue in this case occurred in the context of interstate commerce, as is required to invoke the Act's jurisdiction. 15 U.S.C. § 1703(a).

#### C. The Lake Monticello Subdivision at Issue in this Case Does Not Qualify for the Single Family Residence Exception Provided for in the Act and Subsequent Federal Regulations.

■ The court notes here the defendants' contention that the Lake Monticello development [Lake Monticello] is exempt from the Act because the Department of Housing and Urban Development [HUD] issued an advisory opinion in May, 1987, which stated that "a single family residence" exemption from the Act was appropriate for Lake Monticello, given the facts some of the defendants supplied to HUD.

However, the opinion also clearly states that, pursuant to 24 C.F.R. § 1710.4(b), the Act's anti-fraud provisions (15 U.S.C. § 1703(a)(2)) are still applicable to the development.[1] Furthermore, some doubt exists about whether the defendants supplied HUD with accurate and complete information in their request for an advisory opinion.

There are other reasons why the Lake Monticello subdivision in question in this suit, along with its developer, CCM–VA, do not qualify for the single family residence exemption from the Act's registration and reporting requirements, as that exemption is allowed by 15 U.S.C. § 1702(b)(5) and 24 C.F.R. § 1710.10. The primary reason is that a prerequisite for the exemption is that "there are no offers, by direct mail or telephone solicitation, of gifts, trips, dinners, or other such promotional techniques to induce prospective purchasers ... to visit the subdivision or to purchase ... a lot." 15 U.S.C. § 1702(b)(5)(G). The regulations elaborate on this requirement: "There is no prohibition against using the mails, telephone or other advertising media to promote or advertise the offering or to respond to inquiries from potential purchasers. The only prohibition is that these media cannot contain offers of gifts, trips, dinners or other inducement." 24 C.F.R. Part 1710, App. A, Subpart V(e)(2)(ii). CCM–VA cannot deny that it used advertisements and mail and telephone contact to offer dinners, trips, and travel expenses to potential purchasers. *See, e.g.,* Advertisement Appearing in *New York Daily News,* submitted as Attachment One, Plaintiffs' Motion for Summary Judgment. For these reasons, the Lake Monticello lots that are involved in this suit, along with their developer, are not eligible for the Act's single family residence exemption.

D. A Brief Introduction to the Definition of "Developers or Agents" Under the Act.

Section 1703 of the Act prohibits "developers or agents" from making various in-

complete disclosures to prospective and actual buyers or lessees. It also mandates that the developer allow the purchaser or lessee to revoke the sale or lease of a lot under certain circumstances and directs the developer to repay the purchaser or lessee in the event of such revocations. The question crucial to the resolution of many of the motions before the court is the definition of "developer or agent."

These two terms are defined in the definitions section of the Act as follows: " 'developer' means any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision" (15 U.S.C. § 1701(5)); " 'agent' means any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision; but shall not include an attorney at law whose representation of another person consists solely of rendering legal services." 15 U.S.C. § 1701(6).

The legislative history of the definition of developer is scanty. The court, accordingly, will interpret the Act's definition of developer in light of the plain wording of the Act, persuasive authority, and common sense.

II. *The Court's Rulings on Defendants' Motions*

A. The Court Denies Northeastern Bank's Motion for Summary Judgment.

 Northeastern Bank [the Bank] filed a motion to dismiss, which, since Northeastern submitted material outside the pleadings, became transformed into a motion for summary judgment. Northeastern asks the court to rule in its favor on this motion because, Northeastern argues, it is not a "developer or agent" within the meaning of the Act. Therefore, argues

**1.** This is reinforced by the fact that HUD itself recently filed suit in this court against two of the defendants in this case. *Jack Kemp, Secretary of the Department of Housing and Urban Development v. Cost Control Marketing, et al.,* Civil Action No. 89–0042–C (Filed November 15, 1989).

Northeastern, this court does not have federal question jurisdiction over Northeastern under the Act.

Regarding this issue, there are no cases on point in this district or in the entire Fourth Circuit. Some authority exists in other circuits; those cases are, of course, persuasive but not binding on this court. The case law that does exist emphatically states that financial institutions *acting in the ordinary course of dealing* are not developers under the Act.

In 1980, the Sixth Circuit Court of Appeals held that a lending institution which occasionally took mortgages or deeds of trust on unimproved lots as security for loans, and which then foreclosed upon the default of borrowers according to the terms of the loan agreement, and which sometimes purchased the foreclosed property at the foreclosure sale and offered it for resale was not a developer under the Act. The court came to this conclusion based on the following: (1) none of the tracts of land in question was altered or improved while owned by the lending institution; (2) the land was not replatted or subdivided; and (3) the lending institution's involvement in the land sales was undertaken only as necessitated by the defaulting borrower, and was occasional and incidental in nature. *Cumberland Capital Corp. v. Harris,* 621 F.2d 246 (6th Cir. 1980).

The key to *Cumberland* is whether the activities engaged in were part of the lending institution's normal course of dealing. 621 F.2d at 251. The Sixth Circuit found that the activities in which the bank participated in *Cumberland* were an "outgrowth of its activities as a lending institution." 621 F.2d at 249. According to the Sixth Circuit, whether a court should consider a bank to be a developer for the purposes of the Act hinges on the extent of the bank's participation in the particular development project. 621 F.2d at 251. A bank such as the one in *Cumberland,* which merely finances the various lot sales and has no involvement in the development, marketing, or sale of the land unless foreclosure becomes necessary, is certainly acting in the ordinary course of business. 621 F.2d at 249.

Commercial banks lend money. They analyze the risk, make the loan, and keep their hands off the subject of the loan unless trouble starts to brew. That is their ordinary course of dealing. Commercial banks are not in the business of developing or marketing real estate. Even if commercial banks were inclined to join hands with a developer in the sale or marketing of a project, the tight reins the federal government exercises over them would militate strongly against that type of joint venture. Since the time of Franklin Roosevelt and the infamous bank holiday, the federal government has made every effort to insure that commercial banks adhere to relatively strict controls over their operations and use of money in their control, which money, after all, they hold in trust for hundreds of small depositors. When regulations were relaxed some time ago for savings and loan institutions, those institutions aggressively engaged in the financing, developing, and marketing of very speculative real estate projects. In part because many of these projects failed, the savings and loan industry in some areas became insolvent and left the country with a grave crisis. It is imperative that the same not happen in the commercial banking arena. Allowing commercial banks to exceed the scope of ordinary dealing in real estate ventures would leave open the door to disaster.

The question, then, is under what circumstances a commercial bank exceeds a normal course of dealing in the context of a real estate project. As one example of excessive bank involvement, the *Cumberland* court cited with approval an Illinois federal district court which stated that a commercial bank holding itself out as a financial backer of a subdivision development exceeds its ordinary course of dealing. 621 F.2d at 251, *citing Timmreck v. Munn,* 433 F.Supp. 396 (N.D.Ill.1977). This court agrees with the *Timmreck* and *Cumberland* courts. When a financial institution allows its name to be used in advertisements or announcements for a development, it is in effect lending its pres-

tige and good name to the sales effort. It is participating to an unacceptable degree in the marketing of the project. It has gone beyond its function as a commercial bank to lot purchasers.

At the present time, it is not clear from the facts before the court whether Northeastern Bank exceeded an ordinary course of dealing in its involvement with the Lake Monticello development. Plaintiffs' counsel has submitted to the court and to defendants' counsel a copy of an advertisement which appeared on September 3, 1989, in *The Daily Progress*, a Charlottesville, Virginia, newspaper which circulates widely in Fluvanna County, the site of the Lake Monticello subdivision. Plaintiffs' Counsel's Letter to the Court Dated October 13, 1989; Affidavit of Susan Wagner with Attached Advertisement, Filed on October 13, 1989. In the advertisement, Northeastern Bank is prominently announced to be the "Lead Lender" in Total Land Concepts Corp. The advertisement describes that corporation as "a real estate management conglomerate which directs affiliated companies engaged in the acquisition, marketing, and sale of homesites, new home construction, and home-related services." The announcement conspicuously states that the "affiliates" of Total Land Concepts Corp. include Cost Control Marketing and Management, Inc., Cost Control Marketing and Sales Management of Virginia, Inc., Spectrum Abstract Corporation, and Monticello Development Corporation, all defendants in the case at bar.

While this advertisement may not be directly relevant to the 1987 and 1988 sales activities which are the subject of plaintiffs' suit, it shows that Northeastern Bank now maintains, and inferentially may have previously maintained, a level of involvement and participation in the development activities of some of the defendants that goes beyond the ordinary course of dealing of commercial banks. The plaintiffs should have the opportunity for full discovery as to the past relationship of Northeastern Bank with defendant developers Cost Control Marketing and Management, Inc. and Cost Control Marketing and Sales Management of Virginia, Inc. The court will not dismiss Northeastern Bank as a defendant at this time. The information presently before the court tends to indicate the Bank's participation in activities outside its normal course of dealing. However, this issue will require further development of the record. Accordingly, at this time, the court denies Northeastern Bank's motion for summary judgment.

B. The Court Denies the Motion for Summary Judgment Filed by Cost Control marketing and Sales Management of Virginia, Inc.

■ Cost Control Marketing and Sales Management of Virginia, Inc. (CCM–VA) moves for summary judgment on the ground that it does not fit the definition of "developer or agent" under the Act. CCM–VA does not dispute that it owned lots in a subdivision. It does not dispute that it sold some of those lots to the plaintiffs. This court has found, *supra*, that CCM–VA was involved in a common promotional plan under the Act. All that remains is for the court to determine whether CCM–VA fits the definition of "developer" for purposes of the Act.

The court has no doubt that CCM–VA fits the definition of developer or agent. Common sense, if nothing else, dictates this result. It is true that Congressional drafters have been known to "specialize" or just plain change the meaning of ordinary language when they incorporate that language into bills. However, not even the most linguistically misguided drafter or court would define "night" as meaning "day", and that is akin to what defendant CCM–VA would have the court do if the court were to rule that CCM–VA is not a developer.

■ The Act plainly states that "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision" is a developer. 15 U.S.C. § 1701(5). While courts may look beyond the plain language of the statute in interpreting an ambiguity in the language of the statute, they may not, absent ambiguity, go beyond

that plain language. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). To do so would be patently unreasonable and would subvert the purpose of the law. Further, the Act's prohibitions and punishment of land sale fraud mandate that courts liberally and flexibly construe the Act to effectuate the remedial purpose of the Act. *McCown v. Heidler*, 527 F.2d 204, 207 (10th Cir.1975); *Pierce v. Apple Valley, Inc.*, 597 F.Supp. 1480, 1484 (S.D.Ohio 1984).

The Act also requires that the allegedly fraudulent activity occur in the context of interstate commerce. 15 U.S.C. § 1703(a). The sales activities of CCM–VA clearly involved interstate commerce. CCM–VA sold lots at Lake Monticello to out-of-state residents. Advertisements for lots at Lake Monticello were placed in newspapers such as the *Washington Post*, the *New York Times*, and the *New York Daily News*, all out-of-state newspapers with interstate circulation. *See, e.g.*, Advertisement Submitted as Attachment One, Plaintiffs' Motion for Summary Judgment.

Furthermore, solicitation by mail or telephone alone is sufficient for jurisdiction under the Act. *Commodore Properties, Inc. v. Hills*, 417 F.Supp. 1388, 1390 (D.Neb.1976); *Gaudet v. Woodlake Dev. Co.*, 399 F.Supp. 1005, 1007 (E.D.La.1975). CCM–VA uses its toll-free numbers in arranging for potential purchasers to visit Lake Monticello. CCM–VA's Admissions in Response to Plaintiffs' Request for Admissions, Admission 42; Advertisement Submitted as Attachment One, Plaintiffs' Motion for Summary Judgment. Furthermore, CCM–VA's advertisements provide a coupon to be mailed to its Pennsylvania headquarters. *See, e.g.* Advertisement Submitted as Attachment One, Plaintiffs' Motion for Summary Judgment. CCM–VA also mailed videotapes to prospective buyers. Affidavit of Sharon Volpe, Exhibit B, Plaintiffs' Motion for Summary Judgment.

Accordingly, CCM–VA meets the test of what constitutes a "developer" under the Act. Thus, the court denies its motion for summary judgment.

## C. The Court Denies the Motion for Summary Judgment Filed by Cost Control Marketing and Sales Management, Inc. (CCM).

CCM moves the court to dismiss the plaintiffs' case against it under Rule 12(b)(1) and (6), Fed.R.Civ.P. Since CCM submitted an affidavit along with its motion, the court deems this to be a motion for summary judgment and shall treat it as such.

CCM asserts that it should be dismissed as a defendant because it is not a "developer or agent" within the meaning of the Act. However, as part of its Memorandum in Support of CCM's Motion to Dismiss, CCM submitted the affidavit of William P. Peterson, President of CCM, in which Peterson himself stated that CCM is a "multi-state land developer" (Peterson Affidavit at 1, Submitted as Attachment to Memorandum in Support of CCM's Motion to Dismiss), that CCM–VA and CCM have identical ownership, boards of directors, and management (Peterson Affidavit at 3, 6), and that Peterson directed that CCM–VA be formed for the purpose of purchasing lots within the Lake Monticello subdivision and marketing and selling them to the general public. *Id.* at 3.

These admissions do not in themselves qualify CCM as falling under the Act for purposes of the case at bar. They show, however, clearly that a major connection exists between CCM and CCM–VA. For CCM to fall within the Act in this suit, there must be evidence that CCM was involved as a developer or agent with the Lake Monticello subdivision. 15 U.S.C. § 1701(5) and (6). It is clear that CCM–VA, not CCM, was primarily responsible for the marketing and sale of the Lake Monticello lots it owned. However, the Act also encompasses "indirect" sellers: " 'developer' means any person who, directly or indirectly, sells ... or offers to sell ... or advertises for sale ... any lots in a subdivision." 17 U.S.C. § 1701(5).

The Third Circuit Court of Appeals has held that under the Act, the concept of "indirect seller" encompasses "those who conduct the selling efforts through means

other than direct, face-to-face contact with buyers." *Bartholomew v. Northampton National Bank,* 584 F.2d 1288, 1293 (3d Cir.1978). An indirect seller, for example, is someone who sells lots through an agent. The *Bartholomew* court cautioned that "[t]here is no indication in the language of the statute or in the legislative history of the Act that an indirect seller is other than one who is involved *in some manner* in the selling efforts related to a land development project." 584 F.2d at 1293 (emphasis added).

■ This court concludes that the reasoning of *Bartholomew* is sound. Accordingly, under the *Bartholomew* test, for CCM to remain as a defendant in this suit at this time, there must be some indication that CCM was involved in the selling effort. That indication appears in two documents submitted by the plaintiffs with the Reply Brief of Plaintiffs to Briefs of Various Defendants for Rule 12(b) or Rule 56 Dismissals. The first document, labelled by plaintiffs as "Attachment One," is a memorandum on CCM stationery. It is from Mr. Peterson and is addressed to "members of the board, all sales tracts and all department heads." It notifies the addressees of the appointment of a new executive vice-president in charge of all sales sites in Virginia.

The second document, "Attachment Two," also on CCM stationery, details several new sales procedures for each sales site to follow. Both of these documents were sent to CCM–VA's offices in Virginia. Reply Brief of Plaintiffs at 4. Indeed, Attachment One could only have been directed at CCM–VA's selling operations since, by the admission of its president, "CCM has not acquired title to any real estate in Virginia and specifically [that CCM has not itself acquired title to any land] within the [Lake Monticello] subdivision. Further, CCM in no way sells, offers to sell, or advertises for sale any lot within the subdivision or any other real estate in Virginia." Peterson Affidavit at 7. CCM has sought to contradict any evidence of CCM's involvement in CCM–VA's sales by offering Peterson's assertion that CCM is not involved in any of the sales activities of CCM–VA. Peterson Affidavit at 3–6.

The court concludes that Peterson's denial that CCM was involved with CCM–VA's Lake Monticello sales efforts sets up a substantial fact conflict with plaintiffs' factual evidence that CCM was involved in the selling activities of CCM–VA. Such a conflict precludes summary judgment. Further, the court finds that the present evidence indicates that CCM is an indirect seller. As such, it falls within the definition of "developer" in the Act and it is properly a defendant in this case. Since CCM's assertion that it was not a developer under the Act was the basis of its motion for summary judgment, the court denies that motion for this reason, and because of the clear factual conflict.

D. The Court Denies Monticello Development Corporation's Motion For Summary Judgment.

Monticello Development Corporation (MDC) petitions this court to grant summary judgment in its behalf. MDC asserts that it has not been involved since November, 1986, in developing and marketing property in Lake Monticello and that MDC is not an agent or representative of CCM–VA.

The plaintiffs have alleged that MDC, the original developer of Lake Monticello, is currently wholly owned by CCM–VA. The evidence plaintiffs submitted gives a basis to conclude, on the present evidence, that this allegation is true. CCM–VA admitted that it owned fifty percent (50%) of the common stock of MDC. CCM–VA's Answer to Plaintiffs' Interrogatory Number 45. C. Dice Hammer (who is not related to any of the plaintiffs) owned the other fifty percent of the shares of MDC. The court infers from a Deed of Trust and Security Agreement recorded in Deed Book 199, pages 515–41 of the Clerk's Office of the Circuit Court of the County of Fluvanna, that C. Dice Hammer sold his entire interest in MDC back to MDC. The pertinent part of the Agreement states: "RECITALS: WHEREAS, MDC and C. Dice Hammer executed a certain Agreement on

February 1, 1989 ... whereby Hammer agreed to sell and MDC agreed to purchase ... the outstanding shares of stock Hammer owns in MDC...." Page 1, Deed of Trust and Security Agreement Cited by Plaintiffs at p. 4 of Plaintiffs' Supplemental Memorandum (Submitted by Plaintiffs to the Court on January 4, 1990, with Notification to Defense Counsel). Since CCM–VA owned fifty percent of MDC on February 1, 1989, and since Hammer appears to have sold the remaining MDC shares to MDC on that date, one may reasonably conclude that CCM–VA now fully owns MDC.

■ This court has found, *supra*, that CCM–VA is a developer under the Act. While CCM–VA's complete ownership of MDC does not automatically mean that MDC is a developer under the Act, there is evidence that CCM–VA may have used MDC as a tool to further some of the fraudulent acts alleged by plaintiffs. MDC admitted that each plaintiff, at the time of his or her lot purchase, gave MDC a $1,500 note. Answer and Motion to Dismiss of Defendant Monticello Development Corp. to Plaintiffs' First Amended Complaint, pp. 2–3. Plaintiffs allege that each note stated that it was given in consideration of MDC's undertaking to cause the installation of underground electric and telephone utility lines up to the lot line of the parcel of land sold to each plaintiff. According to plaintiffs, CCM–VA had represented to HUD that electric service had been extended to all lots in the subdivision as of May 8, 1987, a date prior to any sale to any of the present plaintiffs.

MDC is not clear about what was stated in the notes and whether service already had been extended to the lots. MDC somewhat cryptically denies plaintiffs assertions. Answer and Motion to Dismiss of Defendant Monticello Development Corp. to Plaintiffs' First Amended Complaint at 3. MDC, however, has offered no extrinsic evidence to rebut what the plaintiffs have offered. This, obviously, is a conflict over a very material fact. If the plaintiffs' allegations are true and if MDC were aware that it was aiding and abetting in this al-leged fraud, those two factors combined with CCM–VA's complete ownership of MDC would convince this court to find MDC liable under the Act.

The Act is aimed at developers and agents. It has been construed to include all of those engaged in the selling effort (*Bartholomew v. Northampton National Bank*, discussed *supra*); it has also been construed to include banks whose involvement with developers exceeds their ordinary course of business (*Cumberland Capital Corp. v. Harris, Timmreck v. Munn*, both discussed *supra*). The Act is to be liberally construed to effectuate its remedial purpose. *McCown v. Heidler*, 527 F.2d 204 (10th Cir.1975). Accordingly, even though MDC was apparently not directly involved on any face-to-face basis in the selling effort, its total ownership by a seller—CCM–VA, a developer under the Act—coupled with the possibility that it aided and abetted an allegedly fraudulent aspect of the land transactions, persuade this court to apply the Act remedially. The court thus holds that if plaintiffs can prove that a wholly-owned arm of a developer aided in part the alleged frauds actionable under the Act, that wholly-owned corporation is itself liable under the Act. Accordingly, the court denies MDC's motion for summary judgment.

Alleged aiders and abettors to violations of the Act have been held to be properly named as defendants. The *McCown* court allowed an action to proceed under the Act against several individual defendants. The *McCown* court, citing *Kerbs v. Fall River Industries*, 502 F.2d 731, 740 (10th Cir. 1974), stated that one has aided and abetted a fraudulent scheme "even though his assistance consists of mere silence or inaction." 527 F.2d at 207. Aiders and abettors, according to *McCown*, should be held liable whether they are "officers, directors, or *participating planners*." *Id.* (emphasis added). Under this test, this court feels that it is possible for plaintiffs to prove, if the factual disputes are resolved in their favor, that MDC is a participating planner. The persuasive precedent of *McCown* thus gives this court further impetus to deny MDC's motion for summary judgment.

Furthermore, MDC is a necessary party to this suit because, if judgment is granted for the plaintiffs, the notes MDC holds and the payments plaintiffs have made on the notes must be returned and the deeds of trust released in order to give plaintiffs the full recision they ask for under the Act.

### E. The Court Grants the Motion for Summary Judgment Filed by Spectrum Abstract, Inc.

■ Defendant Spectrum Abstract, Inc. [Spectrum] filed a motion to dismiss pursuant to Rules 12(b)(1) and (6), Fed.R.Civ.P. Since, along with its motion, Spectrum submitted material outside of the pleadings, the court will treat this as a motion for summary judgment.

Spectrum provided title and closing services to CCM–VA in connection with the sale of lots in the Lake Monticello subdivision. Plaintiffs allege that Spectrum knew that people purchasing lots from CCM–VA allegedly were not given access to an attorney in connection with the transaction, and also knew, or should have known, that CCM–VA allegedly was charging excessive closing costs. Accordingly, plaintiffs argue, Spectrum aided and abetted in an alleged fraud.

Plaintiffs never allege that Spectrum had anything to do with the sale of the lots. Plaintiffs' allegations about Spectrum relate only to the "paperwork" involved in the consummation of the transaction. Even if the plaintiffs' allegation are true—and Spectrum, by affidavit of its Vice-President, denies that they are—the Act does not apply to Spectrum. As discussed, the Act applies only to developers and agents of developers. This court has concurred, *supra,* with the reasoning of the Third Circuit in *Bartholomew v. Northampton National Bank,* 584 F.2d 1288 (3d Cir.1978), that, although the Act encompasses "indirect sellers," "[t]here is no indication in the language of the statute or in the legislative history of the Act that an indirect seller is other than one who is involved in some manner in the selling efforts related to a land development project." 584 F.2d at 1293. This court finds that there is no evidence or allegation that Spectrum was in any way involved with the selling efforts of the lots in question. Therefore, the court grants Spectrum's motion for summary judgment.

### F. The Court Denies the Motion for Summary Judgment Filed by Preferred Builders of Virginia, Inc. and Handcrafted Homes, Inc.

■ Defendants Preferred Builders of Virginia, Inc. [Preferred] and Handcrafted Homes, Inc. [Handcrafted], filed a motion to dismiss pursuant to Rule 12, Fed.R.Civ.P. The court considers these to be motions for summary judgment, since exhibits and the affidavits of an employee of both defendants accompanied the motions.

Plaintiffs allege that most of the advertising CCM–VA did in the New York metropolitan area offered a house on a lot at Lake Monticello for a price of $69,000. *See, e.g.,* Advertisement, Attachment One to Plaintiffs' Motion for Summary Judgment. The names of Preferred and Handcrafted appeared in much of the advertising.

Plaintiffs further allege that, as an inducement to sign the lot purchase contract, CCM–VA gave each plaintiff a "model home rental agreement" signed by a representative of Handcrafted/Preferred. Jefferson Country Custom Model Home Agreements, Attachments to Affidavit Submitted in Support of Rule 12 Motions of Defendants Handcrafted Homes, Inc., and Preferred Builders of Virginia, Inc. This agreement also included a list of "upgraded building points," which described "options above the standard specification" of the home, which options Handcrafted/Preferred would furnish at its own expense as an additional consideration for the agreement. Agreements at paragraph 4. Plaintiffs allege that this was an elaborate "bait and switch" mechanism, since CCM–VA was only interested in selling lots. According to plaintiffs, when the purchasers later actually went to the builders to try to contract for a home, they found that they could not get a lot and house for $69,000.

Plaintiffs also submit the sworn answer of plaintiffs Marcia and Oswald Fredericks to CCM–VA's interrogatories as evidence of Handcrafted/Preferred's involvement in the selling activities of CCM–VA. The Fredericks stated that during their tour of available lots with CCM–VA salesman Guskind, after the Fredericks had indicated a preference for Lot 318 in Section X,

> We returned to the CCM sales office at the Jefferson Country Model Village World. Mr. Guskind started to explain the model home/discount package which was being offered to a limited number of early lot purchasers. Mr. Michael Rodgers, an on-site representative of Preferred Builders/Handcrafted Homes, Inc., joined us. He explained the terms of the model home site program, the value of its options, as well as the overall projected costs to build one of the model homes or a custom-designed home. He and Mr. Guskind explained that purchase of a lot from CCM on this date *only* would qualify us for free improvements and upgrades to our home. We requested the opportunity to leave the Jefferson Country sales office to further consider and privately discuss our decision. *We were told that our departure would automatically disqualify us for the discount/model home program.* We were also told that the sale price as offered and the availability of Lot 318 could not be honored unless a purchase agreement was executed on this date.

Document Three, Supplemental Memorandum of Plaintiffs to Motions of Various Defendants for Rule 56 Dismissals (emphasis added).

Handcrafted and Preferred submit the affidavit of Michael Berardi, Sr., General Manager of Handcrafted and President of Preferred, in support of their motion for summary judgment. Berardi states that "no sales manager employed by Handcrafted ... and/or Preferred ... ever participated in the sale of a lot at Lake Monticello" (Berardi Affidavit at 2), that the agreements "were for the purpose of inducing an existing lot owner to purchase a home to be constructed by Handcrafted" (*Id.* at 3), and that "a representative of Preferred ... and Handcrafted ... contacted an individual concerning the purchase of a home only after a purchaser had agreed to purchase a lot." *Id.*

These statements flatly contradict the Fredericks' description of Handcrafted/Preferred's role. The Fredericks' statement certainly suggests that the participation by a Handcrafted/Preferred representative induced them to consummate their purchase quickly, without having time to reflect or consult with each other. There is some doubt as to when the Fredericks sale actually occurred. Although it might be true that at the time the Handcrafted/Preferred representative first met with the potential purchaser, the purchaser had agreed to purchase a lot, the circumstances the Fredericks describe indicate that the sale effort was still underway, the fraudulent acts the plaintiffs allege were still in the process of occurring, and the agreement had not been made final in any binding way. The court is concerned by what the Fredericks say was the statement of CCM–VA's and the builders' representative that "purchase of a lot from CCM on this date only would qualify [the Fredericks] for free improvements and upgrades to our home." Fredericks' Affidavit, *supra.* This tends to show that the builders' offers were made for the purpose of inducing a hasty and possibly fraudulent sale.

The clashing affidavit and interrogatory answer cause a pointed factual dispute about this matter. In a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party (*see, e.g., United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)) in determining whether there is a genuine issue for trial, pursuant to Fed.R.Civ.P. 56. That is, to deny the motion, the court must determine that the evidence is "such that a reasonable jury could return a verdict for the non-moving party." *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). This court concludes that, if the dispute is resolved in favor of the plaintiffs, a reasonable jury could find that

Handcrafted and Preferred would have been involved in the Lake Monticello sales effort. Thus, they would be liable under the Act. *See, e.g., Bartholomew, supra.* Viewing the evidence discussed above in the light most favorable to the plaintiffs, this court finds that there is a genuine issue for trial and a legal basis for the plaintiffs' claim should the factual dispute be resolved in plaintiffs' favor. Therefore, the court denies the motions for summary judgment filed by the defendants Handcrafted Homes, Inc., and Preferred Builders, Inc.

G. The Court Holds In Abeyance the Question of Whether Plaintiffs May Potentially Be Entitled to Punitive Damages.

Some of the defendants in this case have asserted that plaintiffs are not entitled under the Act to the punitive damages which they request. This matter has not been briefed by the parties to this case. The question may be premature now, since no determination has been made as to the liability of any of the remaining defendants. Should the plaintiffs prevail on the merits of this case, the court will order a hearing date for this matter and will set out a briefing schedule in a separate, subsequent order.

III. *The Court Denies Plaintiffs' Motion for Summary Judgment*

Applying the summary judgment standards discussed *supra* to the plaintiffs' motion for summary judgment, the court concludes that it must deny that motion. Plaintiffs move for summary judgment against all defendants. The court, *supra,* has dismissed Spectrum Abstract Corporation as a defendant, and the court has already concluded in this opinion that genuine issues of material fact exist with regard to defendants Northeastern Bank, Cost Control Marketing and Sales Management, Inc., Handcrafted Homes, Inc., and Monticello Development Corporation. Thus, the court denies plaintiffs' motion for summary judgment against those defendants at this time, pursuant to Rule 56, Fed.R.Civ.P. Therefore, only the plaintiffs' motion as

regarding Cost Control Marketing and Sales Management of Virginia, Inc. (CCM–VA) remains to be analyzed.

Defendant CCM–VA admits that it "agrees in substance with the facts as alleged by plaintiffs." CCM–VA's Brief in Opposition to Plaintiffs' Motion for Summary Judgment, p. 1. The court, however, concludes that at present many outstanding issues remain with respect to the nature and extent of the fraud plaintiffs allege against CCM–VA. Accordingly, Rule 56, Fed.R.Civ.P., dictates that the court deny plaintiffs' motion for summary judgment.

An appropriate Order shall this day issue.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this day

## ADJUDGED AND ORDERED

as follows:

1. The motion for summary judgment filed by plaintiffs shall be, and it hereby is, denied.

2. The motion for summary judgment filed by defendant Cost Control Marketing and Sales Management, Inc. shall be, and it hereby is, denied.

3. The motion for summary judgment filed by defendant Cost Control Marketing and Sales Management of Virginia, Inc. shall be, and it hereby is, denied.

4. The motion for summary judgment filed by defendant Monticello Development Corporation shall be, and it hereby is, denied.

5. The motion for summary judgment filed by defendant Northeast Bank shall be, and it hereby is, denied.

6. The motion for summary judgment filed by defendants Handcrafted Homes, Inc. and Preferred Builders of Virginia, Inc. shall be, and it hereby is, denied.

7. The motion for summary judgment filed by defendant Spectrum Abstract, Inc. shall be, and it hereby is, granted.

8. The question of whether plaintiffs may be entitled to punitive damages should they prevail on the merits of this case shall be, and it hereby is, held in abeyance.