955 F.2d 203
 Leroy OLSEN, Cheryl Olsen, Plaintiffs-Appellees,
v.
LAKE COUNTRY, INCORPORATED, Defendant-Appellant,
and
Cost Control Marketing and Sales Management, Northeastern
Bank of Pennsylvania N.A., Cost Control Marketing
and Management, Incorporated, Hugh
Boyle, Defendants. (Two Cases)
 Nos. 90-2163, 90-2174.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 5, 1991.
Decided Nov. 18, 1991.
As Amended Dec. 9, 1991 and Jan. 13, 1992.
Certiorari Denied April 6, 1992.
See 112 S.Ct. 1587.
 
 Francis Townley Eck, Eck, Collins & Anderson, Richmond, Va., argued, for defendant-appellant.
 Francis B. Crowther, III, Crowther & Bresee, P.C., Palmyra, Va., argued, for plaintiffs-appellees.
 Before RUSSELL, Circuit Judge, BUTZNER, Senior Circuit Judge, and DUPREE, Senior District Judge for the Eastern District of North Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Lake Country, Inc. ("Lake") appeals from the district court's judgment in favor of Leroy and Cheryl Olsen for damages and costs arising from the sale of real property and violations of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701-1720 (1988). We affirm.
 
 I.
 
 2
 Lake is a Virginia corporation established for the purposes of acquiring lots from members of the public and then placing them on the market for resale to new buyers. Lake Land'Or is a property development in Caroline County, Virginia, originally developed by Lake Land'Or, Inc. ("Land'Or, Inc.") in 1971. The development originally consisted of 2100 lots divided into two parts: Land'Or, which was comprised of approximately 1200 lots, and Heritage, which contained approximately 900 lots.
 
 
 3
 In May 1988, Land'Or, Inc. sold its inventory of lots to Cost Control Marketing and Sales Management of Virginia, Inc. ("CCMV").[1] It also sold all of the stock of a utility company to three private individuals who owned Land'Or, Inc. and CCMV. In August 1988, Lake purchased several lots from CCMV. Additional lots were purchased from individual sellers, resulting in a total of 350 unimproved lots owned by Lake.
 
 
 4
 Lake actively marketed the lots to the general public in Washington, D.C., Maryland, Pennsylvania, New Jersey, New York, and Virginia, utilizing television commercials to promote the lots and inviting viewers to call a toll-free number to arrange a visit to the development. The Olsens responded to one such advertisement and were asked to leave their name and address. Later, they received a telephone call in which they were offered $35 to visit the development, which they accepted. When they visited the property, they were subjected to a sales campaign by Lake employees which included announcements of sales over a radio in the office and the car in which they were escorted around the property, a statement made to them by an "appraiser" that the property would increase in price the very next day, and assurances that they had been pre-approved for credit. They were also subjected to misrepresentations by Lake regarding the availability and cost of utilities for the property and other factors associated with building a home on their lot.
 
 
 5
 By the end of a seven-hour day, the Olsens had agreed to purchase a plot in the Heritage section, for substantially more than the lot was worth. Never did they receive a property report as required by the Act nor was the lot registered with the Department of Housing and Urban Development ("HUD"), all in violation of 15 U.S.C. § 1703. In addition, they later discovered that they had been rejected for credit by the bank to which they had been sent and ended up paying for the property with cash obtained from IRA accounts they closed. In addition, although they had been told that water and sewer service were available to lot owners, such service was found to be grossly inadequate to meet the needs of all lots in the development. Consequently, they brought this civil action under 15 U.S.C. § 1709 seeking damages.[2]
 
 
 6
 The district court granted summary judgment to the Olsens on the issue of liability and subsequently awarded nominal damages and "other costs." Lake raises two issues on appeal. First, Lake contends that it is not a "developer" within the meaning of the Act and is therefore not subject to its registration and disclosure provisions. Second, it contends that it is entitled to the single family residence exemption under 15 U.S.C. § 1702(b)(5).
 
 II.
 
 7
 According to the Act's plain language, we are of the view that Lake is a "developer" within the meaning of the Act. "Developer" is defined under the Act
 
 
 8
 as any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision.
 
 
 9
 15 U.S.C. § 1701(5). Clearly, Lake directly advertised and sold property located in Lake Land'Or.
 
 
 10
 "Subdivision" is defined as
 
 
 11
 any land which is located in any State or in a foreign country and is divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan.
 
 
 12
 15 U.S.C. § 1701(3). "Common promotion plan" is defined as
 
 
 13
 a plan, undertaken by a single developer or a group of developers acting in concert, to offer lots for sale or lease; where such land is offered for sale by such a developer or group of developers acting in concert, and such land is contiguous or is known, designated, or advertised as a common unit or by a common name, such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan.
 
 
 14
 15 U.S.C. § 1701(4). Lake sold land in the common unit known as Lake Land'Or as part of its general promotional campaign.
 
 
 15
 Appellant's principal argument is that, by applying a broad reading of this definition, any seller of property in Lake Land'Or would be a "developer" within the meaning of the Act, including private persons selling their property. That question, however, is not at issue in this case. More important is the undisputed purpose of the Act to prohibit fraud and to protect purchasers of land which is part of a common promotional scheme. See Kemp v. Peterson, 940 F.2d 110, 112 (4th Cir.1991); United States v. Steed, 674 F.2d 284 (4th Cir.), cert. denied, 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 68 (1982). The language of the Act is meant to be read broadly to effectuate this goal. See McCown v. Heidler, 527 F.2d 204 (10th Cir.1975). To exclude all but the original developer from the purview of the Act would clearly circumvent its intent by permitting developers to simply transfer land to separate entities before being sold to the public.
 
 
 16
 HUD's interpretation of the Act as applied in prior cases is instructive. See Markowitz v. Northeast Land Co., 906 F.2d 100, 105 (3rd Cir.1990) (deference given to an agency's reasonable construction of the statute); Cost Control Marketing & Management Inc. v. Pierce, 848 F.2d 47 (3rd Cir.1988) (Congress gave HUD the power to determine whether a seller falls under the Act; therefore, federal court without jurisdiction to issue declaratory relief). In Kemp v. Peterson, 940 F.2d 110 (4th Cir.1991), we considered the propriety of a district court's order enjoining a developer from future violations of the Act. The case had been filed by the Secretary of HUD against CCMV. Although the case concerned the activities at a different development, the Secretary had exerted his authority to petition the court to enjoin violations of the Act.[3] Just as in the present case, the developer in Kemp was not the original developer, but rather had purchased its inventory of lots from the original developer as well as individual sellers. The fact that the Secretary brought the action against them is evidence of HUD's view that secondary sellers are developers within the meaning of the Act.
 
 
 17
 Lake's argument that it only bought and resold lots in a completed subdivision without making further improvements does not persuade us that it was under no obligation to comply with the registration and disclosure provisions of the Act. See Winter v. Hollingsworth Properties, Inc., 777 F.2d 1444 (11th Cir.1985) (scope of statute not limited to the sale of "raw" land). First, the land in question was not, in fact, fully developed. On the contrary, there were serious questions concerning the ability of the water supply and sewer system to service all homes in the subdivision. The utility company whose job it was to provide these services is an affiliate of Lake. Moreover, there is no dispute that the Olsens' lot was undeveloped to the extent that it contained no building at the time it was purchased.
 
 
 18
 Finally, unlike the cases cited by Lake, e.g. Paquin v. Four Seasons of Tennessee, Inc., 519 F.2d 1105 (5th Cir.1975), cert. denied, 425 U.S. 972, 96 S.Ct. 2168, 48 L.Ed.2d 795 (1976); Cumberland Capital Corp. v. Harris, 621 F.2d 246 (6th Cir.1980), Lake was not merely an incidental player in the Lake Land'Or sales scheme; it was actively involved in the planning and promotion of the development. Given Lake's involvement, we are of the view that it was required to comply with the disclosure and registration provisions of the Act. Because it did not, we affirm the district court's finding of liability to the Olsens.
 
 III.
 
 19
 Lake's second argument is that it is entitled to exemption from the Act under the exemption for single-family residences, 15 U.S.C. § 1702(b)(5). The district court refused to apply the exemption because subsection (G) provides that it applies only where there are no offers, by direct mail or telephone solicitation, of gifts, trips, dinners, or other such promotional techniques to induce purchasers or lessees to visit the subdivision or to purchase or lease a lot.
 
 
 20
 The district court found significant the television commercials' offer of a cash gift to visit the subdivision. It accordingly granted summary judgment to Plaintiff on this issue.
 
 
 21
 Preliminarily, we recognize the general rule of construction that exemptions from remedial statutes are to be construed narrowly. See Markowitz v. Northeast Land Co., 906 F.2d 100 (3rd Cir.1990); DeLuz Ranchos Inv. Ltd. v. Coldwell Banker & Co., 608 F.2d 1297 (9th Cir.1979).
 
 
 22
 Lake admits that its television advertisement contained an offer of money to visit the subdivision. However, it argues that the Act prohibits mail or telephone solicitation, and does not contemplate television advertising as a form of prohibited solicitation. We are unpersuaded that the omission of television from the subsection by Congress was meant to indicate its approval of its use by developers to induce potential buyers to visit. The Guidelines for Exemptions Available elaborate on the requirements for the single-family exemption:
 
 
 23
 There is no prohibition against using the mails, telephone or other advertising media to promote or advertise the offering or to respond to inquiries from potential purchasers. The only prohibition is that these media cannot contain offers of gifts, trips, dinners or other inducement.
 
 
 24
 24 C.F.R. § 1710, App. A, Part V(e)(2)(ii) (1991). The guideline makes clear that some advertising is permissible but that advertising containing inducements is not. Lake contends that by including "other media" in the sentence listing what is permitted and thus affecting, by reference, what is not, HUD impermissibly changed the meaning of the act. Congress imbued HUD with responsibility for administering the Act. 15 U.S.C. § 1715(a). We are of the view that HUD's interpretation of the Act, pursuant to this mandate, is reasonable, and should be upheld to effectuate the Act's purpose. See Markowitz, 906 F.2d at 105.
 
 IV.
 
 25
 For the reasons stated, we affirm the judgment of the district court.
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 CCMV was a defendant in this suit but is not a party to this appeal
 
 
 [2]
 The Olsens sought damages rather than rescission of the contract because they eventually built a home on the property
 
 
 [3]
 15 U.S.C. § 1714(a) provides for such authority:
 Whenever it shall appear to the Secretary that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule or regulation prescribed pursuant thereto, he may, in his discretion, bring an action in any district court ... to enjoin such acts or practices....