SYNOVUS BANK, Plaintiff,

v.

James G. KARP, G. Daniel Siegel, and the Karp Family Limited Partnership, Defendants.

Synovus Bank, Plaintiff,

v.

Barron S. Wall, Defendant.

Synovus Bank, Plaintiff,

v.

Kevin J. Tracy, Defendant.

National Bank of South Carolina, Plaintiff,

v.

Anthony J. Barbieri, Defendant.

National Bank of South Carolina, Plaintiff,

v.

3GMA Realty, LLC, and Gerald Abatemarco, Defendants.

Synovus Bank, Plaintiff,

v.

Gregory S. Keary, Defendant.

National Bank of South Carolina, Plaintiff,

v.

Benjamin W. Atkinson and Daniel S. Hinkson, Defendants.

National Bank of South Carolina, Plaintiff,

v.

Katherine H. Williams, Defendant.

Synovus Bank, Plaintiff,

v.

Patricia M. Tracy, Defendant.

Civil Nos. 1:10cv172, 1:10cv201, 1:10cv202, 1:10cv215, 1:10cv217, 1:10cv218, 1:10cv220, 1:10cv221, 1:10cv231.

United States District Court, W.D. North Carolina, Asheville Division.

Aug. 15, 2012.

Albert L. Sneed, Jr., W. Carleton Metcalf, Scott Keegan Dillin, Van Winkle, Buck, Wall, Starnes & Davis, P.A., W. James Johnson, Van Winkle Law Firm, Asheville, NC, for Plaintiff.

Brian C. Athey, Webster Book LLP, Alexandria, VA, Edward Louis Bleynat, Jr., Ferikes & Bleynat, PLLC, Asheville, NC, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

MARTIN REIDINGER, District Judge.

**THIS MATTER** is before the Court on the Plaintiff Synovus Bank's Motion to Dismiss [Doc. 31]; the Magistrate Judge's Memorandum and Recommendation regarding the disposition of such motion [Doc. 36]; and the Plaintiff's and Defendants' Objections to the Memorandum and Recommendation [Docs. 41, 43].

## I. PROCEDURAL BACKGROUND

This case has its origin in a series of collection actions brought by the Plaintiff Synovus Bank, the successor in interest through name change and by merger with The National Bank of South Carolina ("NBSC") ("Synovus Bank" or "Bank"), against the Defendants James G. Karp, G. Daniel Siegel, and the Karp Family Limited Partnership (the "Karp Defendants"); Barron S. Wall; Kevin J. Tracy; Anthony J. Barbieri; Gerald Abatemarco and 3GMA Realty, LLC (the "Abatemarco Defendants"); Gregory S. Keary; Daniel S. Hinkson and Benjamin W. Atkinson (the "Hinkson Defendants"); Katherine H. Williams; and Patricia M. Tracy (collectively, the "Defendants") in the Buncombe County General Court of Justice, Superior Court Division. In its collection actions, the Plaintiff seeks the recovery of money it contends that the Defendants owe pursuant to various loan agreements the Defendants executed in order to finance the purchase of undeveloped lots in a real estate development in Cashiers, North

Carolina, known as the River Rock subdivision ("River Rock"). The Defendants subsequently removed each of these collection actions to this Court.

Following the removal of these actions, the Defendants filed Answers and asserted Counterclaims against the Plaintiff. On December 10, 2010, the Magistrate Judge consolidated these cases for all pretrial proceedings and allowed the Defendants one final opportunity to amend their Answers and assert viable Counterclaims. [Doc. 20]. The Court also directed Synovus Bank to file a consolidated motion to dismiss the Counterclaims and for the Defendants to file a consolidated response. [*Id.*].

Consistent with the Court's Order, several of the Defendants filed Amended Counterclaims.[1] Although these Counterclaims are based on the same general set of facts, the specific factual allegations and claims vary by each Defendant. For example, the Karp Defendants, the Hinkson Defendants, and Defendants Wall, Barbieri, K. Tracy, and Williams assert claims for violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen.Stat. § 75–1.1, *et seq.* ("Chapter 75"); fraud and fraud in the inducement; violation of the North Carolina Mortgage Lending Act, N.C. Gen.Stat. § 53–243.11; negligent misrepresentation; and violation of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701, *et seq.* ("ILSA"). [Karp Am. Counterclaim, Doc. 12; Barbieri Am. Counterclaim, Doc. 26; Hinkson Am. Counterclaim, Doc. 27; Wall Am. Counterclaim, Doc. 30; *see also* K. Tracy Am. Counterclaim, Case No. 1:10cv202, Doc. 13 and Williams Am. Counterclaim, Case No. 1:10cv221, Doc. 13].

---

**1.** Defendants Kevin Tracy, Keary, and Williams did not file further Amended Counterclaims and instead rely on the Amended Counterclaims previously filed in their respec-

tive individual actions. Accordingly, any citations to these Amended Counterclaims will include a reference to those cases' individual case numbers.

The Abatemarco Defendants and Defendants Keary and Patricia Tracy, on the other hand, assert only claims for violation of Chapter 75, violation of the North Carolina Mortgage Lending Act, negligent misrepresentation, and violation of the ILSA. [Abatemarco Am. Counterclaim, Doc. 28; P. Tracy Am. Counterclaim, Doc. 29; *see also* Keary Am. Counterclaim, Case No. 1:10cv218, Doc. 8].

On January 31, 2011, the Bank filed a motion seeking the dismissal of all of the Counterclaims asserted by the Defendants. [Doc. 31]. In support of its motion, the Bank argues that the Defendants' Counterclaims are subject to dismissal because they are not supported by plausible factual allegations and, therefore, fail as a matter of law (the "plausibility argument"); that Defendants' fraud and ILSA claims fail because they are not pled with sufficient particularity as required by Rule 9 of the Federal Rules of Civil Procedure; that the ILSA claims also fail because Synovus Bank is not an "agent or developer" within the meaning of that Act; that the statements forming the basis of Defendants' fraud claims are expressions of opinion that are not actionable in fraud; that the factual allegations do not support the claims for negligent misrepresentations or unfair and deceptive trade practices; and that the North Carolina Mortgage Lending Act claims fail because that Act has been repealed and in any event does not apply to the loans that the Defendants secured from the Bank. [Doc. 32]. The Bank further contends that the Defendants Patricia Tracy, Gerald Abatemarco, and James Karp each waived any counterclaims and defenses pursuant to releases contained in the documents they executed in association with securing the loans at issue. [*Id.*].

In response to the Motion to Dismiss, the Defendants oppose the dismissal of their Counterclaims, arguing that these claims were sufficiently pled and state plausible claims for relief. [Doc. 33].[2]

Pursuant to 28 U.S.C. § 636(b) and the Standing Orders of Designation of this Court, the Honorable Dennis L. Howell, United States Magistrate Judge, was designated to consider the Plaintiff's Motion to Dismiss and to submit a recommendation for its disposition. On October 5, 2011, the Magistrate Judge entered a Memorandum and Recommendation regarding the Plaintiff's Motion. [Doc. 36]. Specifically, the Magistrate Judge rejected the Plaintiff's plausibility argument, finding that the factual allegations as stated in the Amended Counterclaims were sufficient to plead plausible claims for relief. [*Id.* at 15]. The Magistrate Judge went on to conclude, however, that the allegations in the Amended Counterclaims were insufficient to demonstrate that Synovus Bank was an agent or developer within the meaning of the ILSA and therefore recommended that these Counterclaims be dismissed. [*Id.* at 19].

With respect to the Defendants' claims of fraud, the Magistrate Judge concluded that the Defendants had alleged these claims with sufficient particularity and thus recommended that the motion to dismiss be denied as to these Counterclaims. [*Id.* at 22]. As for the claims of negligent misrepresentation, the Magistrate Judge found that the Defendants had failed to make more than conclusory allegations to support their claim that Synovus Bank owed the Defendants a duty of care related to the alleged misrepresentations. [*Id.* at 22–24]. Accordingly, the Magistrate Judge recommended the dismissal of these

---

**2.** The Defendants agree, however, to the dismissal of their counterclaims brought pursuant to the Mortgage Lending Act. [Doc. 34 at 7]. Accordingly, these counterclaims will be dismissed.

Counterclaims. [*Id.*]. With respect to the Defendants' Chapter 75 claims, the Magistrate Judge concluded that the Amended Counterclaims contained sufficient factual allegations to support the Defendants' claims of unfair and deceptive and trade practices by the Bank. Accordingly, the Magistrate Judge recommended that the motion to dismiss the Chapter 75 counterclaims be denied. [*Id.* at 25–26].

Finally, the Magistrate Judge concluded that Defendants Patricia Tracy, Gerald Abatemarco, and James Karp had waived all counterclaims and defenses to Synovus Bank's claims because the documents they executed in connection with their loans contain various releases and waivers. Accordingly, the Magistrate Judge recommended that all of the Counterclaims asserted by these Defendants be dismissed. [*Id.* at 26–30].

Both Synovus Bank and the Defendants filed Objections to the Magistrate Judge's Memorandum and Recommendation. Specifically, Synovus Bank objects to the Magistrate Judge's conclusions regarding the plausibility of the Defendants' counterclaims, as well as to the Magistrate Judge's conclusion that the Amended Counterclaims state claims for fraud and for unfair and deceptive trade practices under Chapter 75. [Doc. 41]. The Defendants object to the Magistrate Judge's recommendation that their ILSA and negligent misrepresentation claims be dismissed. [Doc. 43]. The Defendants further object to the Magistrate Judge's recommendation that all counterclaims asserted by Patricia Tracy, Gerald Abatemarco, and James Karp be dismissed in light of the releases and waivers they executed in their loan documents. [*Id.*].

Both sides have responded to the other's objections. [Docs. 44, 45].[3]

Having been fully briefed, this matter is now ripe for disposition.

## II. STANDARD OF REVIEW

### A. Standard of Review Applicable to Objections to Magistrate Judge's Memorandum and Recommendation

The Federal Magistrate Act requires a district court to "make a *de novo* determination of those portions of the report or specific proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In order "to preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." *United States v. Midgette,* 478 F.3d 616, 622 (4th Cir. 2007). The Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge to which no objections have been raised. *Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). Additionally, the Court need not conduct a *de novo* review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson,* 687 F.2d 44, 47 (4th Cir.1982).

### B. Rule 12(b)(6) Standard of Review

In reviewing a motion to dismiss filed pursuant to Rule 12(b)(6), the Court is guided by the Supreme Court's instructions in *Bell Atlantic Corp. v. Twombly,*

---

**3.** Additionally, on January 18, 2012, Synovus Bank filed a Notice of Subsequently Decided Authority [Doc. 46], bringing to the Court's attention the recently decided opinion of the North Carolina Court of Appeals in the case of *In re Fifth Third Bank, National Association–Village of Penland Litigation,* 719 S.E.2d 171 (N.C.Ct.App.2011).

550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). As the Fourth Circuit has noted, "those decisions require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen,* 684 F.3d 435, 439 (4th Cir.2012).

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). To be "plausible on its face," a plaintiff must demonstrate more than "a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

In reviewing the complaint, the Court must accept the truthfulness of all factual allegations but is not required to assume the truth of "bare legal conclusions." *Aziz v. Alcolac, Inc.,* 658 F.3d 388, 391 (4th Cir.2011). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters,* 684 F.3d at 439.

To survive a Rule 12(b)(6) motion, "a complaint must state a 'plausible claim for relief.'" *Id.* (quoting *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937). Determining whether a complaint states a plausible claim for relief is "a context-specific task," *Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir.2009), which requires the Court to assess whether the factual allegations of the complaint are sufficient "to raise a right to relief above the speculative level," *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. As the Fourth Circuit has recently explained:

> To satisfy this standard, a plaintiff need not forecast evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements. Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is probable, the complaint must advance the plaintiff's claim across the line from conceivable to plausible.

*Walters,* 684 F.3d at 439 (citations and internal quotation marks omitted).

## III. FACTUAL BACKGROUND

Viewing the allegations of the Amended Counterclaims[4] as true, the following is a summary of the relevant facts.

### A. The Defendants' Purchase of Lots at River Rock

River Rock is a subdivision in Cashiers, North Carolina that originally consisted of approximately 4,000 acres of undeveloped land. [*See e.g.,* Karp Am. Counterclaim, Doc. 12 at ¶ 7]. Synovus Bank loaned approximately $12.5 million to third party Legasus of North Carolina, LLC ("Legasus") so that Legasus could purchase and develop River Rock. [*Id.* at ¶¶ 8–11]. Each of the Defendants entered into a contract with Legasus to purchase a lot at River Rock. [*Id.* at ¶ 13]. The purchase price of the lots ranged from $239,900 to $550,000. [*See* App'x 1 to Motion to Dismiss, Doc. 32–32]. The Defendants financed the purchase of these lots by taking out loans with Synovus Bank for ninety percent of the purchase price of the lot. [Karp Am. Counterclaim, Doc. 12 at ¶ 38].[5] The

---

4. Where the factual allegations of the Amended Counterclaims are substantially similar, the Court will cite only to the Amended Counterclaim of the Karp Defendants. Where the allegations vary, the Court will cite to each Amended Counterclaim separately.

5. The one exception is Defendant Hinkson, who financed ninety-five percent of the lot's purchase price. [Hinkson Am. Counterclaim, Doc. 27 at ¶ 22; App'x 1 to Motion to Dismiss, Doc. 32–32].

terms of the loans provided for interest-only payments for a period ranging from one and one-half years to five years. [*Id.;* App'x 1 to Motion to Dismiss, Doc. 32–32]. As part of the agreement to purchase the lots, Legasus took the Defendants' down payments for the lots and transferred the money to an account at Synovus Bank. [Karp Am. Counterclaim, Doc. 12 at ¶ 39]. The Defendants then established an automatic payment mechanism so that these funds would cover the interest payments on the loan until the funds were depleted. [*Id.*].

Synovus Bank hired Marilyn Woods of Woods Appraisal Service to conduct the appraisal of the lots in connection with the loans. [*Id.* at ¶ 32]. Michael Wolf, a loan officer with Synovus Bank, hired Woods because he believed that she would provide an inflated value of the lots. [*Id.* at ¶ 33]. The Defendants allege that Woods did in fact provide inflated appraisals to Synovus Bank. [*See id.* at ¶¶ 33–34, 36]. Specifically, the Defendants allege that Woods failed to consider lots outside of River Rock as comparables and failed to take into account the lack of adequate infrastructure and utilities in the River Rock development. [*Id.* at ¶¶ 35–36]. The Defendants also allege that Synovus Bank knew that these appraisals were inflated but used them to support the loans it provided the Defendants to purchase the lots. [*Id.* at ¶ 36]. Additionally, some of the Defendants contend that Synovus Bank failed to provide them with a copy of the appraisal prior to the closing date of the lots. [*See e.g.,* Wall Am. Counterclaim, Doc. 30 at ¶¶ 41–43].

## B. The Alleged Misrepresentations

In connection with the purchases of the lots, the Defendants allege that Synovus Bank employee Michael Wolf ("Wolf") made various misrepresentations regarding the value of the lots and the viability of River Rock development in general. These representations include statements by Wolf that the lots were "an incredible investment" [Karp Am. Counterclaim, Doc. 12 at ¶ 24] and "a good investment" [K. Tracy Am. Counterclaim, Case No. 1:10cv202, Doc. 13 at ¶ 19]; that Defendant Barbieri "would make money" on the lot [Barbieri Am. Counterclaim, Doc. 26 at ¶ 22]; that River Rock was "a viable development" [Williams Am. Counterclaim, Case No. 1:1cv221, Doc. 13 at ¶ 30]; that future buyers would be attracted to the fact that professional golfer Phil Mickelson had agreed to "do a golf course at River Rock" [*Id.* at ¶ 31]; and that Defendants would be able to sell or re-finance the lots before the money set aside by Legasus to pay the initial eighteen months of interest on the loan was depleted or prior to the expiration of the interest-only portion of the loan [Karp Am. Counterclaim, Doc. 12 at ¶ 27; K. Tracy Am. Counterclaim, Case No. 1:10cv202, Doc. 13 at ¶ 24; Barbieri Am. Counterclaim, Doc. 26 at ¶ 21; Keary Am. Counterclaim, Case No. 1:10cv218, Doc. 8 at ¶ 27].

## C. The Alleged Scheme to Defraud the Defendants

Although the specific factual allegations related to the alleged fraudulent scheme vary somewhat in each of the Amended Counterclaims, the general nature of the alleged scheme is as follows. The Defendants allege that Synovus Bank fraudulently induced them to purchase lots at River Rock at an inflated price by structuring the loan so that the funds they used for the down payment on the lot were used to pay the interest payments on the loan during approximately the first eighteen months. [Karp. Am. Counterclaim, Doc. 12 at ¶ 39]. Synovus Bank was able to inflate the price of the lot by using false appraisals from Woods. [*Id.* at ¶ 36]. Synovus Bank knew that this practice was not sustainable in the long term but, none-

theless, persisted with its plan. [*Id.* at ¶ 40]. In spite of knowing that this was not a sustainable business practice, the Bank participated in a scheme designed to inflate the prices of the lots and issue loans to the Defendants on property that it knew was worth only a fraction of the loans' value in order to maximize Synovus Bank's short-term financial growth. [Wall Am. Counterclaim, Doc. 30 at ¶ 65]. Accordingly, Synovus Bank made loans that it knew posed a high level of long-term risk "because it was attempting to grow rapidly by making loans that were of low quality and charging borrowers a premium yield." [*Id.* at ¶ 66]. The Bank received guaranteed interest payments from Legasus at closing to bolster its short-term growth. [*Id.* at ¶¶ 53, 58–59]. In total, Synovus Bank received approximately one million dollars over a two-year period from the transfer of seller-paid interest from Legasus to Synovus Bank upon the closing of approximately thirty loans tied to the purchase of lots at River Rock. [*Id.* at ¶¶ 62–63]. The Bank also received a small loan origination fee. [*Id.* at ¶¶ 54, 61].

In short, the Defendants contend that Synovus Bank undertook the risk associated with lending money to unqualified individuals to purchase property that Synovus Bank knew was overvalued and, in some cases, knew that the individuals would not be able to make payments on these loans once the interest-only period ended, in order to stimulate short-term revenue. [*See* Karp. Am. Counterclaim, Doc. 12 at ¶ 26, 31, 36, 40; Barbieri Am. Counterclaim, Doc. 26 at ¶ 21]. The Defendants allege that the Bank disregarded the "substantial long term risk" to its business from this practice in order to create a short-term appearance of profitability on its financial statements. [K. Tracy Am. Counterclaim, Case No. 1:10cv202, Doc. 13 at ¶¶ 45, 48, 49]. This scheme came to a halt after the collapse of the real estate market in 2008.

[Wall Am. Counterclaim, Doc. 30 at ¶¶ 74–79].

## IV. ANALYSIS

### A. Plausibility of Defendants' Counterclaims

 Synovus Bank objects to the Magistrate Judge's conclusion that the Defendants' claims are sufficiently plausible to withstand scrutiny under *Twombly* and *Iqbal.* Specifically, the Bank argues that the underlying theory of the Defendants' Counterclaims is so contrary to the Bank's long-term business interests as to be implausible as a matter of law. [Doc. 41 at 5–12].

In support of this argument, the Bank relies on three district court decisions, *Feeley v. Total Realty Management,* 660 F.Supp.2d 700 (E.D.Va.2009), *Goldstein v. Bank of America,* No. 1:09cv329, 2010 WL 1252641 (W.D.N.C. Jan. 10, 2010) (Howell, M.J.), and *Bank of America v. Lykes,* No. 1:09cv435, 2010 WL 2640454 (W.D.N.C. May 20, 2010) (Howell, M.J.). In each of these cases, however, the court determined that the plaintiffs had failed to allege specific facts to support their claims and had failed to make plausible allegations to support the theory that a lender would be willing to collude or conspire with a developer to make under-collateralized loans to borrowers to the detriment of the lender's own financial interests. *See Feeley,* 660 F.Supp.2d at 708; *Goldstein,* 2010 WL 1252641, at *5; *Lykes,* 2010 WL 2640454, at *6. By contrast, in the present case, the Defendants' allegations, when assumed to be true, establish a plausible reason (*i.e.,* the desire for short-term profitability) for the Bank's willingness to knowingly make under-collateralized loans to the Defendants, even if such loans may have been, as argued by the Bank, contrary to the Bank's long-term financial interests. Further, the Defendants have pled sufficient

factual allegations detailing the basis of their claims against the Bank. As such, *Feeley, Goldstein,* and *Lykes* are distinguishable from the present case.

As the events of the recent economic crisis have demonstrated, financial institutions do not always make the most prudent business decisions, and they sometimes may accept what would otherwise appear to be unreasonable economic risks for the sake of immediate, short-term profitability. Thus, while the Bank's conduct, as alleged by the Defendants, may not appear to have been the most prudent course of action for the Bank to take in terms of its long-term business interests, that certainly does not mean that such conduct is not plausible as a matter of law.[6] Indeed, as the Magistrate Judge correctly noted, assuming the truth of the Defendants' Counterclaims, "Synovus Bank would not be the first corporation in the history of modern economics to undertake an action that carried substantial risk to its long term financial viability in order to increase short term profits or revenue." [Doc. 36 at 14]. Construing the well-pled factual allegations of the Counterclaims in the light most favorable to the Defendants, the Court concludes that the Defendants have pled sufficient factual allegations in the Amended Counterclaims to state claims that are plausible on their face. For these reasons, the Bank's first objection is overruled, and the Motion to Dismiss the Defendants' Counterclaims as implausible is denied.

**B. Fraud Claims**

[4] The Bank objects to the Magistrate Judge's conclusion that the Amended Counterclaims set forth valid claims for

fraud and are therefore not subject to dismissal pursuant to Rule 12(b)(6). Specifically, the Bank argues that these claims have not been pled with the requisite specificity, and that the representations are nothing more than statements of opinions and are therefore not actionable. [Doc. 41 at 12–14].

[5] In order to state a valid claim for fraud under North Carolina law, a party must allege a false representation or concealment of a material fact that: (1) was reasonably calculated to deceive; (2) was made with the intent to deceive; (3) did in fact deceive the plaintiff; and (4) resulted in damages to the party. *Anderson v. Sara Lee Corp.,* 508 F.3d 181, 189 (4th Cir.2007). Additionally, the party must demonstrate any reliance on the false representations was reasonable. *See id.*

[6] Where a party's allegations sound in fraud, the allegations must satisfy the heightened pleading standards of Rule 9 of the Federal Rules of Civil Procedure. *Cozzarelli v. Inspire Pharmaceuticals Inc.,* 549 F.3d 618, 629 (4th Cir.2008). Rule 9(b) provides that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). Rule 9 applies not only to claims asserting common law fraud, but to all claims where the allegations have the substance of fraud. *Cozzarelli,* 549 F.3d at 629. A claim is subject to dismissal under Rule 12(b)(6) for failure to state a claim if it does not comply with Rule 9(b). *Harrison v. Westinghouse Savannah Riv-*

---

6. In essence, the Bank's argument appears to be that if the theory of recovery underlying the claim is *unlikely,* the claim is subject to dismissal on the basis of implausibility. Such an argument, however, reads too much into the *Iqbal* standard. *Iqbal* does not require the Court to determine the *likelihood* of the facts alleged but rather to determine whether the factual allegations pled in support of that claim are *sufficient* to render the claim *plausible.*

er Co., 176 F.3d 776, 783 n. 5 (4th Cir. 1999).

Here, a review of each of the Defendants' Amended Counterclaims reveals that the Defendants have alleged the general time, place and content of each alleged fraudulent statement, while also identifying the person who made each statement and the recipient of each statement. These allegations are sufficient to comport with the requirements of Rule 9(b) and thus the Magistrate Judge correctly concluded that the Defendants have stated claims for fraud. The Bank's contention that the Defendants failed to plead their fraud counterclaims with sufficient particularity is, therefore, rejected.

■ The Bank further contends that the Defendants' fraud counterclaims must be dismissed to the extent that they are premised upon mere expressions of opinion. "A representation which is nothing more than an opinion as to the value of property, absent something more, does not constitute actionable fraud." Hall v. T.L. Kemp Jewelry, Inc., 71 N.C.App. 101, 106, 322 S.E.2d 7, 11 (1984). While the Bank discounts the Defendants' fraud claims as merely relying on statements of opinions expressed by Bank employee Michael Wolf, a review of the Defendants' allegations reveals that at least some of the misrepresentations alleged were more than mere statements of opinion. For example, the Karp Defendants alleged that Wolf told them that "even after commission and costs, the Defendants would make a profit because they were buying Phase I inventory at Phase I pricing, which had built in appreciation of ten percent over Phase II lots" and that, because the Phase II lots had to "be sold by Legasus salespersons at set prices as determined by Legasus," the Defendants as independent owners "could decide to sell their Lot at pricing below the Phase II pricing and still at least break even on their investment."

[Karp Am. Counterclaim, Doc. 12 at ¶ 28]. The statements that the Defendants were buying "Phase I inventory at Phase I pricing" and that "Phase II lots must be sold by Legasus salespersons at set prices as determined by Legasus" are clearly statements based upon then existing facts, not statements based upon opinion or predictions of future actions or outcomes. Likewise, the statement that the Phase II lots had to be sold by Legasus salespersons at set prices is a statement of fact based upon Legasus policy (i.e., an established requirement) and is not an opinion.

■ Admittedly, some of the misrepresentations that were alleged to have been made amount to nothing more than statements of opinion by Wolf. For example, Defendant Williams alleges that in December of 2006, Wolf stated that he "felt good" about the River Rock development [Williams Am. Counterclaim, Case No. 1:10cv221, Doc. 13 at ¶ 19], and Defendant Barbieri alleges that Wolf stated that Barbieri "would make money" if he bought the lot because it was in the first tract of land that would be subdivided at River Rock and therefore "he would be able to get a building permit" on his lot before lots in other phases of River Rock, which would "make his lot more valuable and easier to sell." [Barbieri Am. Counterclaim, Doc. 26 at ¶ 22]. Even though such statements are merely expressions of opinion, as the Magistrate Judge correctly recognized, "a statement purporting to be opinion may be the basis for fraud if, at the time it is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener." Leftwich v. Gaines, 134 N.C.App. 502, 509–10, 521 S.E.2d 717, 723, disc. rev. denied, 351 N.C. 357, 541 S.E.2d 713 (1999). The Defendants have alleged that Wolf made such statements to the Defendants knowing the same to be

false and with the intent to deceive the Defendants. [*See* Karp Am. Counterclaim, Doc. 12 at ¶¶ 58–60; Barbieri Am. Counterclaim, Doc. 26 at ¶¶ 101 –02; Hinkson Am. Counterclaim, Doc. 27 at ¶¶ 115–17; Wall Am. Counterclaim, Doc. 30 at ¶¶ 110–12; K. Tracy Am. Counterclaim, No. 1:10cv202, Doc. 13 at ¶¶ 83–85; Williams Am. Counterclaim, Case No. 1:10cv221, Doc. 13 at ¶ 97–99]. Thus, even if some of Wolf's representations were expressions of opinion, the Defendants have still stated an adequate basis for their fraud claims to survive a Rule 12(b)(6) motion.[7]

For these reasons, the Bank's objections are overruled, and the Motion to Dismiss the Defendants' fraud counterclaims is denied.

### C. Chapter 75 Claims

The Bank further objects to the Magistrate Judge's recommendation that the Motion to Dismiss be denied as to the Defendants' Chapter 75 claims. [Doc. 41 at 14–16].

 To state a claim for unfair and deceptive trade practices under Chapter 75, a party must allege sufficient facts to show "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *Spartan Leasing, Inc. v. Pollard*, 101 N.C.App. 450, 460–61, 400 S.E.2d 476, 482 (1991). A deceptive practice is one that has "the capacity or tendency to deceive the average consumer, but proof of actual deception is not required." *Id.* at 461, 400 S.E.2d at 482.

 The Bank argues that to the extent that the Defendants' claims are based on allegations related to false appraisals,

such allegations should not be considered because these appraisals were conducted for the benefit of the Bank and not the Defendants, and thus it was not reasonable for the Defendants to rely upon them. Even if such appraisals do not support the Defendants' Chapter 75 claims, however, the Amended Counterclaims contain numerous other allegations of what would constitute unfair and deceptive trade practices, such as false representations regarding the value of the lots, the status of the development at River Rock, and the ability of the Defendants to sell their lots prior to the expiration of the loan term. As the Magistrate Judge correctly recognized, each of these statements had the "capacity to mislead" the Defendants and can thus constitute unfair and deceptive trade practices. Moreover, "[p]roof of fraud necessarily constitutes a violation of the prohibition against unfair and deceptive acts." *Winston Realty Co. v. G.H.G., Inc.*, 314 N.C. 90, 97, 331 S.E.2d 677, 681 (1985). Because the Court has concluded that the Defendants have stated plausible fraud claims with enough particularity to survive the Plaintiff's Motion to Dismiss, the Court likewise will deny the Motion to Dismiss with respect to the Chapter 75 claims. The Bank's objection, therefore, is overruled.

### D. ILSA Claims

 The Defendants object to the Magistrate Judge's recommendation that their claims under the ILSA be dismissed, arguing that their allegations are sufficient to establish that Synovus Bank was a "developer" or "agent of the developer" within the meaning of the ILSA. [Doc. 43 at 6–10].

---

7. Of course, it remains to be seen whether the Defendants will be able to present a forecast of evidence sufficient for all of their fraud claims to survive a summary judgment challenge.

The ILSA "is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 778, 96 S.Ct. 2430, 2433, 49 L.Ed.2d 205 (1976). "The Act also requires sellers to inform buyers, prior to purchase, of facts which would enable a reasonably prudent individual to make an informed decision about purchasing a piece of real property." *Burns v. Duplin Land Dev., Inc.*, 621 F.Supp.2d 292, 301 (E.D.N.C.2009).

An individual who purchases a lot may bring a civil action under the ILSA against a "developer or agent" who violates Section 1703(a). 15 U.S.C. § 1709; *see also Burns*, 621 F.Supp.2d at 301. A "developer" is defined as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision...." 15 U.S.C. § 1701(5). An "agent" is defined as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision...." 15 U.S.C. § 1701(6).

As the Magistrate Judge correctly noted [Doc. 36 at 17], a lending institution acting in the ordinary course of its business is generally not considered a "developer" within the meaning of the ILSA. *See Cumberland Cap. Corp. v. Harris*, 621 F.2d 246, 251 (6th Cir.1980); *Kenneally v. Bank of Nova Scotia*, 711 F.Supp.2d 1174, 1191–92 (S.D.Cal.2010) (collecting cases); *Hammar v. Cost Control Mktg. and Sales Mgmt. of Va., Inc.*, 757 F.Supp. 698, 702 (W.D.Va.1990). "It is only where a financial institution acts beyond its ordinary course of dealing as a lending institution and participates in the actual development, marketing or sale of property that liability may arise under ILSA." *Thompson v. Bank of Am.*, No. 7:09–CV–89–H, 2011

WL 1253163, at *1 (E.D.N.C. Mar. 30, 2011) (citations omitted). While the Defendants have asserted that Synovus Bank was a developer or agent within the meaning of the ILSA, they have failed to allege sufficient facts to support such a finding. The Defendants' factual allegations, when separated from their conclusory statements, claim that Wolf appeared at off-site sales events, made statements regarding the quality of the lots as investments, and made one statement that the Bank was one of the major funders of the development. They do not allege, however, that the Bank had authority to sell lots or that it actually did sell any lots to Defendants. At best, the factual allegations set forth in the Amended Counterclaims state that Wolf was at the off-site event only to speak to potential buyers about obtaining financing for the purchase of a lot. The Defendants' attempt in their Response brief to re-characterize their allegations is of no effect. [*See* Doc. 43 at 7 ("of course, the only purpose of this event was to sell lots in River Rock")]. Further, Wolf's alleged statements regarding the value of the lots and that the Bank was one of the major funders of the project cannot fairly be said to demonstrate that the Bank participated in the development to such a degree that it went beyond its ordinary position as a lender and should now be considered a "developer" for the purposes of the ILSA. Further, unlike the plaintiffs in *Hammar v. Cost Control Marketing & Sales Management Inc.*, 757 F.Supp. 698, 702–03 (W.D.Va.1990), a case on which the Defendants rely, the Defendants have not produced advertising material suggesting the Bank may be an "affiliate" of the Developer. As the Magistrate Judge correctly concluded, the Defendants have failed to allege facts sufficient to make out a claim based on the Bank having stepped outside of the ordinary course of its business as a lender such that liability could be imposed

under the ILSA. Accordingly, the Defendants' objection is overruled, and the Defendants' ILSA claims are dismissed.

### E. Negligent Misrepresentation Claims

The Defendants object to the Magistrate Judge's recommendation that their claims for negligent misrepresentation be dismissed, arguing that they have alleged sufficient facts to support their contention that the Bank undertook a duty of care to the Defendant when its employees chose to make statements regarding the quality of the Defendants' investments in River Rock. [Doc. 43 at 10–13]. The Defendants' argument, however, is without merit.

■ A bank owes a borrower only those duties that are specified in the loan agreement. *See Camp v. Leonard,* 133 N.C.App. 554, 560, 515 S.E.2d 909, 913 (1999) ("a lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party"). The Defendants have not identified any cases construing North Carolina law that recognize an extra-contractual duty arises simply because misrepresentations are made before loan agreements are executed. At least one case in which prior representations were apparently made, *Branch Banking & Trust Company v. Thompson,* did not mention such a distinction. *See* 107 N.C.App. 53, 61, 418 S.E.2d 694, 699 (noting misrepresentation by BB & T officers prior to execution of loan documents but concluding that "[t]he record does not reveal any facts suggesting that the [defendants] reposed any sort of special confidence in BB & T which would serve to give rise to a fiduciary relationship."), *disc. rev. denied,* 332 N.C. 482, 421 S.E.2d 350 (1992).

Here, the Magistrate Judge correctly concluded that the Defendants' allegations do not support a finding of any type of special relationship between Synovus Bank and the Defendants beyond that of the typical lender-borrower relationship. [Doc. 36 at 24]. Accordingly, the Defendants' objection is overruled, and the Defendants' negligent misrepresentation claims are dismissed.

### F. Waiver by Defendants P. Tracy, Abatemarco, and Karp

■ Finally, the Defendants object to the Magistrate Judge's conclusion that Defendants Patricia M. Tracy, Gerald M. Abatemarco, and James G. Karp waived any counterclaims and defenses through releases executed in their loan documents. [Doc. 43 at 13–16]. Specifically, the Defendants contend that the releases are unenforceable pursuant to public policy. [*Id.*].

North Carolina courts have recognized that "an exculpatory contract will be enforced unless it violates a statute, is gained through inequality of bargaining power, or is contrary to a substantial public interest." *Fortson v. McClellan,* 131 N.C.App. 635, 636, 508 S.E.2d 549, 551 (1998). The Court agrees with the Magistrate Judge's assessment that the Defendants' characterization of the public interest implicated by this case is overly expansive. The Court declines to interpret the public policy of North Carolina so broadly as to prohibit the enforcement of an exculpatory clause provision executed in the midst of a voluntary and arms-length transaction to procure financing for an investment property. *See Andrews v. Fitzgerald,* 823 F.Supp. 356, 378 (M.D.N.C.1993) (noting that North Carolina courts have found a "substantial public interest" present only with waivers of liability for physical injury). Furthermore, the "unequal bargaining power" claimed by these Defendants is lacking. These Defendants "were free to have made other investment decisions or to have elected not to invest at all" in their

Lots, and they have failed to establish that they were unable to obtain financing from other lenders. *Id.*

As the Magistrate Judge correctly noted, the Defendants "have not provided the Court with any legal authority suggesting that North Carolina courts would invalidate such a contract based on the public policy exception." [Doc. 36 at 29]. The Defendants still have not done so. Accordingly, the Defendants' objection is overruled, and all counterclaims of Patricia Tracy, Gerald Abatemarco, and James Karp are hereby dismissed.

## V. CONCLUSION

Having conducted a *de novo* review of those portions of the Memorandum and Recommendation to which objections were filed, the Court concludes that the Magistrate Judge's proposed conclusions of law are supported by and are consistent with current case law.

Accordingly, **IT IS, THEREFORE, ORDERED** that the Plaintiff's Objections to the Memorandum and Recommendation of the Magistrate Judge [Doc. 41] is **OVERRULED**; the Defendants' Objections [Doc. 43] are **OVERRULED**; and the recommendation of the Magistrate Judge [Doc. 36] is **ACCEPTED.**

**IT IS FURTHER ORDERED** that the Plaintiff's Motion to Dismiss [Doc. 31] is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) The Motion to Dismiss is **GRANTED** with respect to the Counterclaims asserted by Defendants Patricia Tracy, Gerald Abatemarco, and James Karp, and these Counterclaims are hereby **DISMISSED;**

(2) The Motion to Dismiss is further **GRANTED** with respect to all of the Defendants' Counterclaims arising under the ILSA and the North Carolina Mortgage Lending Act and for negligent misrepresentation, and these claims are hereby **DISMISSED;**

(3) The Motion to Dismiss is **DENIED** with respect to the Counterclaims for fraud and unfair and deceptive trade practices asserted by Defendants G. Daniel Siegel, The Karp Family Limited Partnership, Barron S. Wall, Kevin J. Tracy, Anthony J. Barbieri, 3GMA Realty, LLC, Gregory S. Keary, Benjamin W. Atkinson, Daniel S. Hinkson, and Katherine H. Williams.

**IT IS FURTHER ORDERED** that the parties shall conduct an initial attorneys' conference within fourteen (14) days of the entry of this Order and shall file a Certificate of Initial Attorneys' Conference within seven (7) days thereafter.

**IT IS SO ORDERED.**

## MEMORANDUM AND RECOMMENDATIONS

DENNIS L. HOWELL, United States Magistrate Judge.

Pending before the Court is Plaintiff's Motion to Dismiss [# 31]. This consolidated action stems from the purchase of undeveloped lots in a real estate development in Cashiers, North Carolina called River Rock. Defendants each purchased lots in River Rock. Defendants financed the purchase of these lots by taking out loans with the National Bank of South Carolina. After Defendants defaulted on the loans, Plaintiff Synovus Bank, as the successor in interest of The National Bank of South Carolina, filed collection actions against Defendants. Defendants then asserted a number of counterclaims against Synovus Bank. Synovus Bank moves to dismiss these counterclaims in their entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court **RECOMMENDS** that the District Court grant in

part and deny in part Plaintiff's Motion to Dismiss.

## I. Procedural Background

Synovus Bank is a Georgia corporation and the successor in interest through name change and by merger with The National Bank of South Carolina. (Karp Am. Counterclaim ¶¶ 1–2; Wall Am. Counterclaim ¶¶ 1, 3; Keary Am. Counterclaim ¶¶ 1–4; Hinkson Am. Counterclaim ¶ 2; Williams Am. Counterclaim ¶ 2; P. Tracy Am. Counterclaim ¶¶ 1, 4.) Synovus Bank initiated separate collection actions against Defendants James G. Karp, G. Daniel Siegel, and the Karp Family Limited Partnership (the "Karp Defendants"); Barron S. Wall; Kevin J. Tracy; Anthony J. Barbieri; Gerald Abatemarco and 3GMA Realty, LLC (the "Abatemarco Defendants"); Gregory S. Keary; Daniel S. Hinkson and Benjamin W. Atkinson (the "Hinkson Defendants"); Katherine H. Williams; and Patricia M. Tracy (collectively, the "Defendants") in the General Court of Justice for Buncombe County, North Carolina seeking the recovery of money it contends Defendants owe pursuant to various loan agreements the Defendants executed in order finance the purchase of lots at River Rock. Defendants then each removed the collection actions to this Court. After holding a hearing, the Court consolidated the cases for all pre-trial proceedings and allowed Defendants one final opportunity to amend their Answers and assert viable counterclaims. (Order, Dec. 10, 2010.) The Court also directed Synovus Bank to file a consolidated motion to dismiss the counterclaims and for Defendants to file a consolidated response.

Consistent with the Court's prior Order, Defendants filed amended counterclaims. Although these counterclaims are based on the same general set of facts, the specific factual allegations and claims vary by defendant. The Karp Defendants, the Hinkson Defendants, Defendants Wall, Barbieri, K. Tracy, and Williams assert claims for violation of the North Carolina Deceptive Trade Practices Act, fraud, fraud in the inducement, violation of the Mortgage Lending Act, negligent misrepresentation, and two claims pursuant to the Interstate Land Sales Full Disclosure Act ("ILSA"). The Abatemarco Defendants and Defendants Keary and P. Tracy assert claims for violation of the North Carolina Deceptive Trade Practices Act, violation of the Mortgage Lending Act, negligent misrepresentation, and two claims pursuant to the ILSA.

Synovus Bank now moves to dismiss all of the counterclaims asserted by Defendants. Specifically, Synovus Bank contends that the claims are subject to dismissal because the counterclaims are not supported by plausible factual allegations and, therefore, fail as a matter of law. Put simply, Synovus Bank contends that the scheme alleged in the Amended Counterclaims is not plausible because the conduct runs contrary to Synovus Bank's business interests. In addition, Synovus Bank contends that Defendants' fraud and ILSA claims fail because they are not pled with particularity as required by Rule 9 of the Federal Rules of Civil Procedure, that the ILSA claims fail because Synovus Bank is not a proper entity capable of being sued under the ILSA, that the statements forming the basis of Defendants' fraud claims are expressions of opinion and, thus, are not actionable in fraud, that the factual allegations do not support the counterclaims for negligent misrepresentations or unfair and deceptive trade practices because Synovus Bank owes no duty of care to Defendants, and that the North Carolina Mortgage Lending Act counterclaims fail because it has been repealed and does not apply to the loans Defendants secured from Synovus Bank. Finally, Synovus Bank contends that Defendants P. Tracy, Gerald Abatemarco, and Karp each waived

all counterclaims and defenses pursuant to a waiver contained in the documents they executed in association with securing the loans at issue. In response to the Motion to Dismiss, Defendants agree to the dismissal of the counterclaims brought pursuant to the Mortgage Lending Act. (Defs.' Mem. Opp'n Mot. Dismiss at 7.)

## II. Factual Background[1]

### A. Defendants purchase lots at River Rock

River Rock is a subdivision in Cashiers, North Carolina that originally consisted of approximately 4000 acres of undeveloped land. (*See e.g.*, Karp Am. Counterclaim ¶ 7.) Synovus Bank loaned approximately $12.5 million to third party Legasus of North Carolina, LLC ("Legasus") in order to purchase and develop River Rock. (*See e.g.*, *id.* ¶¶ 8–11.) Each of the Defendants entered into a contract with Legasus to purchase a lot at River Rock. (*See e.g.*, *id.* ¶ 13; Ex. 5–A to Pl.'s Mot. Dismiss.) The purchase price of the lots ranged from $239,900 to $550,000. (*See* App. 1 to Pl.'s Mot. Dismiss.)[2]

The Defendants financed the purchase of these lots by taking out loans with Synovus Bank for ninety percent of the purchase price of the lot. (*See e.g.*, Karp Am. Counterclaim ¶ 38.)[3] The terms of the loans provided for interest only payments for a period ranging from one and one-half years to five years. (*See e.g.*, *id.*; App. 1 to Pl.'s Mot. Dismiss.) As part of the agreement to purchase the lots, Legasus took Defendants' down payments for the lots and transferred the money to an account at Synovus Bank. (*See e.g.*, Karp Am. Counterclaim ¶ 39.) Defendants then established an automatic payment mechanism so that these funds would cover the interest payments on the loan until the funds were depleted. (*See e.g.*, *id.*)

Synovus Bank hired Marilyn Woods of Woods Appraisal Service to conduct the appraisal of the lots in connection with the loans. (*See e.g.*, *id.* at ¶ 32.) Michael Wolf, a loan officer with Synovus Bank, hired Woods because he believed that she would provide an inflated value of the lots. (*See e.g.*, *id.* at ¶ 33.) Defendants allege that Woods did in fact provide inflated appraisals to Synovus Bank. (*See e.g.*, *id.* at ¶¶ 33–34, 36.) Specifically, Defendants allege that Woods failed to consider lots outside of River Rock as comparables and failed to take into account the lack of adequate infrastructure and utilities in the River Rock development. (*See e.g.*, *id.* at ¶¶ 35–36.) Defendants also allege that Synovus Bank knew that these appraisals were inflated but used them to support the loans it provided Defendants to purchase the lots. (*See e.g.*, *id.* at ¶ 36.) In addition, some of the Defendants contend that Synovus Bank failed to provide them with a copy of the appraisal prior to the closing date of the lots. (*See e.g.*, Wall Am. Counterclaim at ¶¶ 41–43.)

### B. The Alleged Misrepresentations

In connection with the purchases of the lots, Defendants allege that Wolf made

---

1. Where the factual allegations in the nine pleadings are substantially similar, the Court will cite only to the Amended Counterclaim of the Karp Defendants as (*see e.g.*, Karp. Am. Counterclaim ¶ —). Where the allegations vary, the Court will cite to each Amended Counterclaim separately.

2. In support of its Motion to Dismiss, Plaintiff attached an appendix consolidating the information contained in various financial documents contained in the record. For simplicity sake, the Court will cite to Appendix 1 rather than each of the individual documents from which this information is drawn.

3. The one exception is Defendant Hinkson, who financed ninety-five percent of the lot's purchase price. (Hinkson Am. Counterclaim ¶ 22; App. 1 to Pl.'s Mot. Dismiss.)

various misrepresentations regarding the value of the lots and the viability of River Rock development in general. These representations include statements by Wolfe that the lots were an incredible investment (Karp Am. Counterclaim at ¶ 24), a good investment (K. Tracy Am. Counterclaim at ¶ 19), that Defendant Barbieri would make money on the lot (Barbieri Am. Counterclaim at ¶ 22), River Rock was a viable development (Williams Am. Counterclaim at ¶ 30), that future buyers would be attracted to the fact that Phil Mickelson had agreed to "do a golf course at River Rock" (Id. at ¶ 31), and that Defendants would be able to sell or re-finance the lots before the money set aside by Legasus to pay the initial eighteen months of interest on the loan was depleted or prior to the expiration of the interest only portion of the loan (Karp Am. Counterclaim at ¶ 27; K. Tracy Am. Counterclaim at ¶ 24; Barbieri Am. Counterclaim at ¶ 21; Keary Am. Counterclaim at ¶ 27).

## C. The Alleged Scheme to Defraud Defendants

Although the specific factual allegations related to the alleged fraudulent scheme varies slightly in each of the Amended Counterclaims, the general nature of the scheme remains constant throughout the nine Amended Counterclaims. Defendants allege that Synovus Bank fraudulently induced them to purchase lots at River Rock at an inflated price by structuring the loan so that the funds they used for the down payment on the lot was used to pay the interest payments on the loan during the first approximate eighteen months. (See e.g., Karp. Am. Counterclaim ¶ 39.) Synovus Bank was able to inflate the price of the lot by using false appraisals from Woods. (See e.g., id. ¶ 36.) Synovus Bank knew that this practice was not sustainable long term but, nonetheless, persisted with its plan. (See e.g., id. ¶ 40.)

In spite of knowing that this was not a sustainable business practice, Synovus Bank participated in a scheme designed to inflate the prices of the lots and issue loans to Defendants on property that it knew was worth only a fraction of the loans' value in order to maximize Synovus Banks's short term financial growth. (See e.g. Wall Am. Counterclaim ¶ 65.) Accordingly, Synovus Bank made loans that it knew posed a high level of long term risk to Synovus Bank "because it was attempting to grow rapidly by making loans that were of low quality and charging borrowers a premium yield." (Id. at ¶ 66.) Synovus Bank received guaranteed interest payments from Legasus at closing to bolster its short term growth. (See e.g., Wall Am. Counterclaim at ¶¶ 53, 58–59.) In total, Synovus Bank received approximately one million dollars over a two year period from the transfer of seller paid interest from Legasus to Synovus Bank upon the closing of approximately thirty loans tied to the purchase of lots at River Rock. (Id. at ¶¶ 62–63.) Synovus Bank also received a small loan origination fee. (Id. ¶¶ 54, 61.)

In short, Defendants contend that Synovus Bank undertook the risk associated with lending money to unqualified individuals to purchase property that Synovus Bank knew was overvalued and, in some cases, knew that the individual would not be able to make payments on the loan once the interest only period ended, in order to stimulate short term revenue. (Karp. Am. Counterclaim ¶ 70-1; Barbieri Am. Counterclaim ¶ 21.) By increasing short term revenue in this manner, Synovus Bank was able to increase its short term profitability on its financial statements. (See e.g., K. Tracy Am. Counterclaim ¶¶ 45, 48.) Synovus Bank disregarded the "substantial long term risk" to its business from this practice "because it believed that rapid real estate price appreciation would contin-

ue to occur in the short term and thus provide a market that would yield a third party purchaser to buy the Lot with funds from a third party lender or market conditions would allow the re-finance of the Lot with funds from a third party lender." (*Id.* at ¶ 49.) This scheme came to a halt after the collapse of the real estate market and eventually resulted in the failure of the National Bank of South Carolina. (*See* Wall Am. Counterclaim ¶¶ 74–79.) This action ensued.[4]

### III. Legal Standard

The central issue for resolving a Rule 12(b)(6) motion is whether the counterclaims state a plausible claim for relief. *See Francis v. Giacomelli*, 588 F.3d 186, 189 (4th Cir.2009). In considering Plaintiff's motion, the Court accepts the allegations in the Amended Counterclaims as true and construes them in the light most favorable to the Defendants. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir.2009); *Giacomelli*, 588 F.3d at 190–92. Although the Court accepts well-pled facts as true, it is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement...." *Consumeraffairs.com*, 591 F.3d at 255; *see also Giacomelli*, 588 F.3d at 189.

The counterclaims need not contain "detailed factual allegations," but must contain sufficient factual allegations to suggest the required elements of a cause of action. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007); *see also Consumeraffairs.com*, 591 F.3d at 256. "[A] for-

mulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965. Nor will mere labels and legal conclusions suffice. *Id.* Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

The Amended Counterclaims are required to contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974; *see also Consumeraffairs.com*, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. 662, 129 S.Ct. at 1949; *see also Consumeraffairs.com*, 591 F.3d at 255. The mere possibility that the Plaintiff acted unlawfully is not sufficient for a counterclaim to survive a motion to dismiss. *Consumeraffairs.com*, 591 F.3d at 256; *Giacomelli*, 588 F.3d at 193. Ultimately, the well-pled factual allegations must move defendant's counterclaims from possible to plausible. *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974; *Consumeraffairs.com*, 591 F.3d at 256.

Where, a party's allegations sound in fraud, however, the allegations must also satisfy the heightened pleading standards of Rule 9. *Cozzarelli v. Inspire Pharmaceuticals Inc.*, 549 F.3d 618, 629 (4th Cir. 2008); *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 188 (4th Cir.2007). Rule 9(b) provides that when "alleging fraud or mistake, a party must state with particularity

---

4. In their Memorandum in Opposition to Motion to Dismiss, Defendants rely on a number of documents and factual allegations that were not contained in their Amended Counterclaims. In addition, Defendants reference the factual allegations in other proceedings.

None of these documents or allegations, however, are relevant to the question of whether the Amended Counterclaims state a claim for relief. Going forward, the Court will strike any pleadings that contain such references.

the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). Rule 9 applies not only to claims asserting common law fraud, but to all claims where the allegations have the substance of fraud. *Cozzarelli,* 549 F.3d at 629. A claim is subject to dismissal under Rule 12(b)(6) for failure to state a claim if it does not comply with Rule 9(b). *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 n. 5 (4th Cir.1999).

## IV. Analysis

Synovus Bank moves to dismiss the Amended Counterclaims on a number of grounds. As a threshold matter, Synovus Bank contends that all of the Amended Counterclaims fail because the alleged scheme underlying each counterclaim is implausible as a matter of law. Synovus Bank also contends that the fraud, fraud in the inducement, and ISLA counterclaims fail because they fail to satisfy Rule 9(b)'s requirement that Defendants plead such counterclaims with particularity. Individually, Synovus Bank contends that the ILSA counterclaims fail because Synovus Bank is not a developer within the meaning of the ISLA; the fraud counterclaims fail because Defendants have alleged only expressions of opinions that cannot constitute fraud under North Carolina law; the unfair and deceptive trade practices counterclaims fail because Defendants have not alleged unfair or deceptive conduct on the part of Synovus Bank; and the negligent misrepresentation counterclaims fail because Synovus Bank owed no duty to Defendants. Finally, Synovus Bank contends that Defendants Patricia Tracy, Gerald Abatemarco, and James Karp each waived all counterclaims and defenses by executing loan documents containing a waiver.

### A. Implausibility

As an initial matter, Synovus Bank contends that all of the counterclaims fail as a matter of law because the scheme underlying each of the counterclaims is so contrary to Synovus Bank's long term business interests as to be implausible as a matter of law and, thus, fails to comply with the requirements of *Twombly* and *Iqbal.* In support of its position, Synovus Bank relies on three district court decisions, *Feeley v. Total Realty Mgmt.,* 660 F.Supp.2d 700 (E.D.Va.2009)[5], *Goldstein v. Bank of America,* No. 1:09cv329, 2010 WL 1252641 (W.D.N.C. Jan. 10, 2010) (Howell, Mag. J.); and *Bank of America v. Lykes,* No. 1:09cv435, 2010 WL 2640454 (W.D.N.C. May 20, 2010) (Howell, Mag. J.). Both *Goldstein* and *Lykes* held that the schemes alleged in the complaint and counterclaims at issue were implausible as a matter of law and recommended that the District Court dismiss the claims as such. *Goldstein,* 2010 WL 1252641, at *4–6; *Lykes,* 2010 WL 2640454, at *4–6. These cases, however, both suffered from the same flaw—a failure to plead specific factual allegations supporting the claims. *Goldstein,* 2010 WL 1252641, at *4–5; *Lykes,* 2010 WL 2640454, at *6.

Here, Defendants allege that Synovus Bank participated in a scheme to maximize short term revenue by lending money to unqualified individuals to purchase property that Synovus Bank knew was overvalued and, in some cases, knew that the individual would not be able to make payments on the loan once the interest only period ended. (Karp. Am. Counterclaim ¶ 70–1; Barbieri Am. Counterclaim ¶ 21.)

---

5. The Court notes that some Courts have rejected the *Feeley* Court's interpretation of the plausibility standard as set forth in *Twombly* and *Iqbal. See e.g., Dobyns v. U.S.,* 91 Fed.Cl. 412, 424–428 (Fed.Cl.2010).

Defendants allege that by increasing short term revenue in this manner, Synovus Bank was able to increase its short term profitability on its financial statements. (*See e.g.* K. Tracy Am. Counterclaim ¶¶ 45, 48.) In short, Synovus Bank was willing to accept the long term risk associated with the loans because the structure of the loan guaranteed approximately 18 months of payments from the money provided by Legasus. Moreover, Synovus Bank disregarded the long term risk from this practice "because it believed that rapid real estate price appreciation would continue to occur in the short term and thus provide a market that would yield a third party purchaser to buy the Lot with funds from a third party lender or market conditions would allow the re-finance of the Lot with funds from a third party lender." (*Id.* at ¶ 49.)

Although the likelihood of Synovus Bank undertaking the actions alleged in the Amended Counterclaims may not be high due to the serious risk to its long term financial health, the Court cannot say, as a matter of law, that the factual allegations are so implausible that they should be disregarded, and the Court should dismiss the Amended Counterclaims in their entirety. Synovus Bank would not be the first corporation in the history of modern economics to undertake an action that carried substantial risk to its long term financial viability in order to increase short term profits or revenue. *Twombly* and *Iqbal* did not alter the age old requirements that the Court must accept the well-pled allegations in the Amended Counterclaims as true and construe the counterclaims in the light most favorable to Defendants, including drawing all reasonably inferences in favor of the Defendant. *See e.g.,* 5B Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, *Federal Practice and Procedure,* § 1357 (3d ed.2007); *Giacomelli,* 588 F.3d at 190–92. Here, Defendants have pled

sufficient factual allegations in the Amended Counterclaims to state a counterclaim that is plausible on its face. *See Iqbal,* 129 S.Ct. at 1949. To hold otherwise would be to expand the Supreme Court's holdings in *Iqbal* and *Twombly* beyond their intention, and absent guidance from the United States Court of Appeals for the Fourth Circuit or the United States Supreme Court, this Court is unwilling to do so. Put simply, it is not the role of the Court at the motion to dismiss stage to weigh the merits of the factual allegations in the Amended Counterclaims. Accordingly, the Court **RECOMMENDS** that the District Court deny the Motion to Dismiss to the extent it seeks to dismiss the Amended Counterclaims in their entirety for failure to plead claims that are plausible as a matter of law.

## B. The ILSA

The ILSA "is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.,* 426 U.S. 776, 778, 96 S.Ct. 2430, 2433–34, 49 L.Ed.2d 205 (1976). The ILSA is based on the same notion of full disclosure that permeates the Securities Act of 1933. *Id.* "The Act also requires sellers to inform buyers, prior to purchase, of facts which would enable a reasonably prudent individual to make an informed decision about purchasing a piece of real property." *Burns v. Duplin Land Dev., Inc.,* 621 F.Supp.2d 292, 301 (E.D.N.C.2009).

An individual who purchases a lot may bring a civil action under the ILSA against a "developer or agent" who violates Section 1703(a). 15 U.S.C. § 1709; *Burns,* 621 F.Supp.2d at 301; *Nahigian v. Juno Loudoun, LLC,* 684 F.Supp.2d 731, 742 (E.D.Va.2010) ("A private cause of action

arises under the Act only against a 'developer or agent' "). Section 1701 defines a "developer" as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision...." 15 U.S.C. § 1701(5). The statute does not limit the definition of a developer to the original entity that subdivides undeveloped land and offers lots for sale. *U.S. Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.*, 64 F.3d 920, 925 (4th Cir.1995); *Olsen v. Lake Cnty. Inc.*, 955 F.2d 203, 205 (4th Cir.1991). An "agent" is defined as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision; but shall not include an attorney at law whose representation of another person consists solely of rendering legal services...." 15 U.S.C. § 1701(6).

Synovus Bank contends that the ILSA counterclaims are subject to dismissal because it is not a developer or agent within the meaning of the statute. As a general rule, lending institutions acting in the ordinary course of their business are not considered developers within the meaning of the ILSA. *See Cumberland Cap. Corp. v. Harris*, 621 F.2d 246, 251 (6th Cir.1980); *Hammar v. Cost Control Mktg. and Sales Mgmt. of Va., Inc.*, 757 F.Supp. 698, 702 (W.D.Va.1990); *Kenneally v. Bank of Nova Scotia*, 711 F.Supp.2d 1174, 1191–92 (S.D.Cal.2010) (collecting cases). "A bank ... which merely finances the various lot sales and has no involvement in the development, marketing, or sale of the land unless foreclosure becomes necessary, is certainly acting in the ordinary course of business." *Hammar*, 757 F.Supp. at 702. A commercial bank such as Synovus Bank, however, may step outside of its ordinary role as a lending institution and be considered a developer under the ILSA where it directly or indirectly markets property for sale. *See* 15 U.S.C. § 1701(5); *Cumber-*

*land*, 621 F.2d at 251; *Hammar*, 757 F.Supp. at 702; *Kenneally* 711 F.Supp.2d at 1192; *Timmreck v. Munn*, 433 F.Supp. 396 (N.D.Ill.1977); *Thompson v. Bank of America*, No. 7:09cv89, 2011 WL 1253163, at *1 (E.D.N.C. Mar. 30, 2011). As the United States District Court for the Western District of Virginia explained in *Hammar*:

When a financial institution allows its name to be used in advertisements or announcements for a development, it is in effect lending its prestige and good name to the sales effort. It is participating to an acceptable degree in the marketing of the project. It is has gone beyond its function as a commercial bank to lot purchasers.

757 F.Supp. at 702–3.

The factual allegations in the Amended Counterclaims fail to support a claim that Synovus Bank was so involved in advertising the lots for sale that it went beyond its function as a commercial bank and could be considered a developer under the ILSA. As a threshold matter, there are no allegations in the Amended Counterclaims that Synovus Bank's logo was contained on the advertising and promotion materials for River Rock. *See Nahigian v. Juno Loudoun, LLC*, 684 F.Supp.2d 731, 747 (E.D.Va.2010) (denying motion to dismiss because of the "near universal prevalence of the [defendant's] name and logo" and the numerous misrepresentations made by its employees.) Instead, Defendants rely on the fact that Michael Wolf, as an agent of Synovus Bank, "participated in off-site sales presentations to sell lots at the River Rock subdivision," including the Summer Sail event and the Grand Opening sales event. (*See e.g.,* Williams Am. Counterclaim ¶ 23; Barbieri Am. Counterclaims ¶ 12.) The Amended Counterclaims, however, contain no factual allegations suggesting that his attendance as a loan officer at these events constituted the type of involvement by Synovus Bank in the sale,

offer to sale, or advertising for sale of lots such that Synovus Bank falls within the ILSA's definition of a developer. In fact, the Amended Counterclaims suggest that Wolf was only there to speak to potential buyers about obtaining financing for the purchase of a lot.[6] (*See e.g.*, P. Tracy A. Counterclaim ¶¶ 19, 22.)

Moreover, the alleged statements made by Wolf to Defendants that the lots were good investments and that Defendants could refinance or resell the lots prior to the maturity date of the loan, made during the course of his dealings with Defendants as loan officer, are insufficient to hold Synovus Bank liable as a developer under the ILSA. Finally, the lone allegation that Wolf stated to one of the Defendants that "the Bank was one of the major funders of the development of River Rock" is insufficient, at a matter of law, to constitute the type of activity by a lending institution for it to be considered a developer. (Barbieri Am. Counterclaim ¶ 23.) The allegations in the Amended Counterclaims are insufficient to demonstrate that Synovus Bank shed it role as an ordinary lending institution and actively participated in the advertisement for sale of the lots at River Rock. Accordingly, the Court **RECOMMENDS** that the District Court grant the Motion to Dismiss as to the ILSA claims.

## C. Fraud

The elements of fraud under North Carolina law are: (1) the false representation or concealment of a material fact; (2) that is reasonably calculated to deceive; (3) is made with the intent to deceive; (4) does in fact deceive the plaintiff; and (5) damages that result from the false representation or concealment. *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 189 (4th Cir.2007) (applying North Carolina law). In addi-

tion, a plaintiff must reasonably rely on the false representations. *Id.* Generally, a representation that is only a statement of one's opinion, cannot constitute a false representation for purposes of a fraud claim. *Myrtle Apartments, Inc. v. Lumbermen's Mut. Cas. Co.*, 258 N.C. 49, 127 S.E.2d 759, 761 (N.C.1962) (holding that an engineer's report recommending that a boiler be replaced after the heating season could not constitute fraud); *Leftwich v. Gaines*, 134 N.C.App. 502, 521 S.E.2d 717, 722–23 (N.C.Ct.App.1999); *compare Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 374 S.E.2d 385, 389–90 (N.C. 1988) (holding that representation in statement from contractor that work had been completed and payment was due was not an opinion). "However, the general rule that no one is liable for an expression of opinion is not a hard and fast rule; ... it does not apply to the dishonest expression of an opinion not actually entertained.'" *Leftwich*, 521 S.E.2d at 723 (*quoting* 37 C.J.S. *Fraud* § 13 (1997)). As the Court of Appeals in *Leftwich* explained, "a statement purporting to be opinion *may* be the basis for fraud if, at the time it is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener." *Id.* (emphasis added); *see also Olympus Managed Health Care, Inc. v. Am. Housecall Physicians, Inc.*, 662 F.Supp.2d 427, 438 (W.D.N.C. 2009) (Conrad, C.J.); *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07cv275, 2011 WL 1134453, at *6 (E.D.N.C. Jan. 25, 2011) ("But a purported opinion or promissory representation may support a fraud claim if, at the time the statement is made, the speaker actually believes to the contrary and makes the statement with an intent to deceive the other party.").[7]

---

6. The Court disregards the numerous conclusory allegations contained in the Amended Counterclaims. *See Consumeraffairs.com*, 591 F.3d at 255.

7. Accordingly, Plaintiff's contention that all of the fraud claims fail because they are based

Defendants allege a number of false representations and omissions that Wolf made to them, which they contend were made with the intent to deceive. In addition, Defendants allege that they relied on these allegedly false representations to their detriment in deciding to purchase lots at River Rock. Moreover, the Amended Counterclaims specifically identify who made the statements, to whom they were made, and both the context and approximate time frame of the statements, satisfying the requirements of Rule 9(b). Even if these statements are expressions of opinions by Wolf, Defendants can still prevail if they can show that when Wolf made the statements, he held an opinion contrary to the opinion he expressed, and that he did so with the intent to deceive Defendants into purchasing the lots. *See Olympus Managed Health Care,* 662 F.Supp.2d at 438; *Leftwich,* 521 S.E.2d at 723. Although Defendants will bear a heavy burden of demonstrating the ultimate viability of the fraud counterclaims, the Amended Counterclaims set forth a valid claim for fraud and are not subject to dismissal pursuant to Rule 12(b)(6). The Court **RECOMMENDS** that the District Court deny the Motion to Dismiss as to the fraud claims.

### D. Negligent Misrepresentation

Under North Carolina law, the tort of negligent misrepresentation requires that the plaintiff: (1) justifiably rely; (2) to plaintiff's detriment; (3) on information prepared without reasonable care; (4) by an individual owing the plaintiff a duty of care. *Guyton v. FM Lending Servs., Inc.,* 199 N.C.App. 30, 681 S.E.2d 465, 478 (N.C.Ct.App.2009); *Hospira,* 671 S.E.2d at

12; *see also Geo Plastics v. Beacon Dev. Co.,* 434 Fed.Appx. 256, 259–60 (4th Cir. 2011) (applying North Carolina law) (unpublished).

Fatal to Defendants' counterclaim on this issue is the fact that the Amended Counterclaims fail to allege factual allegations supporting an essential element of a negligent misrepresentation claim—that Synovus Bank and Wolf owed Defendants a duty of care related to the alleged misrepresentations.[8] The alleged misrepresentations in this case do not involve representations or omissions regarding the terms and conditions of the loans offered by Synovus Bank. Instead, Defendants allege that Wolf made numerous misrepresentations regarding the value of the lots, the progress of the development of River Rock, and potential for Defendants to resell the lots prior to the expiration of the loans. Under North Carolina law, however, the banker-customer or lender-debtor relationship generally does not give rise to a fiduciary relationship. *See Branch Banking and Trust Co. v. Thompson,* 107 N.C.App. 53, 418 S.E.2d 694, 699 (N.C.Ct. App.1992) ("[P]arties to a contract do not thereby become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract and the duties set forth in the U.C.C."); *Lassiter v. Bank of North Carolina,* 146 N.C.App. 264, 551 S.E.2d 920, 922–23 (N.C.Ct.App.2001); *Camp v. Leonard,* 133 N.C.App. 554, 515 S.E.2d 909, 913 (N.C.Ct. App.1999) ("[A] lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party."); *Wagner v. Branch Banking and*

---

solely on expressions of opinion is misplaced as North Carolina law specifically allows for fraud claims based on statements of opinion. *See Olympus Managed Health Care,* 662 F.Supp.2d at 438; *Leftwich,* 521 S.E.2d at 723.

8. Defendants' conclusory allegations that the bank owed Defendants a duty are insufficient to survive a motion to dismiss. *See Consumeraffairs.com,* 591 F.3d at 255.

*Trust Co.*, 179 N.C.App. 436, 2006 WL 2528495, at *2 (N.C.Ct.App.2006) (unpublished) ("[T]his court has acknowledged that a lender has a duty to perform those responsibilities specified in a loan agreement, but has declined to impose any duty beyond those expressly provided for in the agreement."). Moreover, the Amended Counterclaims fail to allege facts supporting any type of special relationship between Wolf and Defendants beyond that of the typical loan officer-customer that might give rise to a duty of care above and beyond that typical of the debtor-creditor or banker-customer relationship. *See generally Thompson*, 418 S.E.2d at 699 (recognizing that under the proper circumstances the bank-customer relationship could give rise to fiduciary relationship). Accordingly, the Court **RECOMMENDS** that the District Court grant the Motion to Dismiss as to the negligent misrepresentation claims.

**E. Unfair and Deceptive Trade Practices**

In order to make out a *prima facie* counterclaim for unfair and deceptive trade practices, a defendant must show that: (1) the plaintiff committed an unfair or deceptive act or practice; (2) that this act or practice was in or affecting commerce; and (3) that the act or practice proximately caused the defendant's injury. *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 529 S.E.2d 676, 681 (N.C.2000); *Hospira Inc. v. Alphagary Corp.*, 194 N.C.App. 695, 671 S.E.2d 7, 12 (N.C.Ct. App.2009); *Sessler v. Marsh*, 144 N.C.App. 623, 551 S.E.2d 160, 167 (N.C.Ct.App.

2001). A practice is unfair if it " 'is immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers.' " *Branch Banking and Trust Co. v. Thompson*, 107 N.C.App. 53, 418 S.E.2d 694, 699 (N.C.Ct.App.1992) (*quoting Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 266 S.E.2d 610, 621 (N.C.1980)); *Sessler*, 551 S.E.2d at 167. A practice is deceptive where it has the tendency or capacity to deceive. *Thompson*, 418 S.E.2d at 699; *Sessler*, 551 S.E.2d at 167. "In making a claim of unfair and deceptive trade practices on a theory of misrepresentation or fraud, a plaintiff must show that a defendant's words or conduct possessed 'the tendency or capacity to mislead' or create the likelihood of deception.' " *Hospira*, 671 S.E.2d at 12 (*quoting Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397, 403 (1981)). Moreover, a defendant does not have to show actual deception to prevail, he or she need only demonstrate that the acts of plaintiff "possessed the tendency or capacity to mislead or create the likelihood of deception." *RD & J Props. v. Lauralea–Dilton Enters., LLC*, 165 N.C.App. 737, 600 S.E.2d 492, 500–501 (N.C.Ct.App. 2004).

As a threshold matter, Plaintiff's contention that Defendants' unfair and deceptive trade practices counterclaims are subject to dismissal because a bank owes no duty of care to its customers is without merit. Unlike a claim for negligent misrepresentation, duty of care is not an element of a claim under N.C. Gen.Stat. § 75–1.1.[9] Moreover, the Amended Counterclaims contain numerous factual allegations sup-

---

**9.** Plaintiff's reliance on *Pappas v. NCNB Nat'l Bank*, 653 F.Supp. 699 (M.D.N.C.1987), is misplaced as the Court did not, as Plaintiff's contend, dismiss the unfair and deceptive trade practices claims "because ... [the] bank owned no duty to borrowers regarding the alleged misrepresentation." (Pl.'s Reply Br. 17.) In fact, *Pappas* held that no affirma-

tive misrepresentation even occurred. *Pappas*, 653 F.Supp. at 703–4. While the Court did hold that the bank was under no duty to correct the plaintiff's unilateral misunderstanding of the term "prime rate" as used by the bank, it did not dismiss the unfair and deceptive trade practices claim on this ground. *Id.* at 707.

porting the unfair and deceptive trade practices counterclaims, including that Synovus Bank used false appraisals that they knew were inflated and that Wolf made several misrepresentations to Defendants regarding the value of the lots, the status of the River Rock development, and Defendants' ability to sell the lots prior to the expiration of the loans' terms. Accepting the factual allegations in the Amended Counterclaims as true, these alleged misrepresentations had the "capacity to mislead" potential purchasers like Defendants. *See RD & J Props.*, 600 S.E.2d at 500–501. Accordingly, the Court **RECOMMENDS** that the District Court deny Plaintiff's Motion to Dismiss as to the unfair and deceptive trade practices counterclaims.

### F. Waiver

Plaintiff contends that Defendants P. Tracy, Abatemarco, and Karp have waived all counterclaims and defenses against Synovus Bank because the documents they executed contain various releases. Defendant P. Tracy executed a Modification and Amendment of Note and Deed ("Modification") of Trust in January 2010. (Ex. 7–D to Pl.'s Mot. Dismiss.) Pursuant to the express terms of the Modification, Defendant P. Tracey acknowledged that "Borrower has no defense to the enforcement of the Loan Documents" and that "Borrower acknowledges Lender's compliance with all terms, conditions and obligations of the Loan Documents to date and hereby releases Lender and any subsequent assignee or note holder of all liability thereunder." (*Id.* at ¶ 5(b)-(c).) In addition, the Modification contained the following language:

> Borrower releases and discharges Lender and Lender's agents, attorneys, employees and officers from any and all actions, caused of action, claims, demands or damages of any kind on account of or arising out of any event, action, omission or matter (whether known or unknown) occurring prior to the date of this Agreement, including but not limited to the negotiation, execution, delivery or performance of the Loan Documents, the administration of the Loan Documents, the negotiation and actions taken with respect to the defaults existing or occurring under the Loan Documents and the loan transactions evidenced by the Loan Documents.

(*Id.* at ¶ 6.)

Defendants Abatemarco and Karp signed Guaranties for Notes executed by 3GMA Realty and the Karp Family Partnership and Daniel Siegel. (Ex. 1–B to Pl.'s Mot. Dismiss; Ex. 4–C to Pl.'s Mot. Dismiss.) These Guaranties also contained identical releases, which provide:

> The Undersigned waives any and all defenses, claims and discharges of Borrower, or any other obligor pertaining to indebtedness, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Undersigned will not assert, plead or enforce against Lender any defense of waiver, release, statute of limitations, res judicata, statute of frauds, fraud, incapacity, minority, usury, illegality or unenforceability which may be available against Lender to Borrower or any such other person liable in respect of any indebtedness, or any setoff available against Lender to Borrower or any such other person, whether or not on account of a related transaction.

(Ex. 1–B at ¶ 7 to Pl.'s Mot. Dismiss; Ex. 4–C at ¶ 7 to Pl.'s Mot. Dismiss.) Plaintiff contends that the express language in these agreements bars the counterclaims asserted by Defendants P. Tracy, Abatemarco and Karp. Defendants do not contest the fact that these waivers encompass their counterclaims. Rather, they contend that the waivers are unenforceable because they are contrary to law and public policy.

In North Carolina, courts will enforce an exculpatory contract "unless it violates a statute, is gained through inequality of bargaining power, or is contrary to a substantial public interest." *Fortson v. McClellan,* 131 N.C.App. 635, 508 S.E.2d 549, 551 (N.C.Ct.App.1998); *see also Sylva Shops Ltd. P'ship v. Hibbard,* 175 N.C.App. 423, 623 S.E.2d 785, 790 (N.C.Ct. App.2006); *Andrews v. Fitzgerald,* 823 F.Supp. 356, 378 (M.D.N.C.1993). "This principle arises out of 'the broad policy of the law which accords to contracting parties freedom to bind themselves as they see fit....'" *Hibbard,* 623 S.E.2d at 790 (*quoting Hall v. Sinclair Refining Co.,* 242 N.C. 707, 89 S.E.2d 396, 397–98 (N.C. 1955)).

None of these exceptions apply to the provisions at issue. The allegations in the Amended Counterclaim do not support a finding of inequality in bargaining power that would warrant the Court nullifying the contract entered into between the parties. These were investment properties; Defendants purchased undeveloped lots with the intention of selling them for a profit prior to the expiration of the loans' term. Defendants were not forced to buy these lots as an investment, much less at any particular price, and could have chosen not to buy a lot at all. *See Hibbard,* 623 S.E.2d at 790 ("Defendants were not forced to lease this particular space."); *Andrews,* 823 F.Supp. at 378 ("The investor-plaintiffs were free to have made other investment decisions or to have elected not to invest at all."). And nothing prevented Defendants from engaging their own advisors to assist in valuing the property or making a decision whether to invest in a lot at River Rock.

Moreover, under the facts of this case as alleged in the Amended Counterclaims, financing the purchase of an undeveloped lot as a speculative investment property does not amount to the type of substantial pub-

lic interest found by North Carolina courts to warrant the invalidation of an otherwise valid contractual provision. The contracts between the Defendants and Synovus Bank do "not create a risk of injury to the public or the rights of third parties." *Hibbard,* 623 S.E.2d at 790. This is not a case where if Defendants refused to sign the documents in question they would lose their primary residence or be kicked out of their home. The waivers at issue were contained in documents associated with financing or re-financing the purchase of an undeveloped lot that Defendants purchased with the intention of selling for a profit prior to the expiration of the loans' terms. Defendants have not provided the Court with any legal authority suggesting that North Carolina courts would invalidate such a contract based on the public policy exception. Accordingly, the Court **RECOMMENDS** that the District Court **GRANTS** the Motion to Dismiss as to Defendants Tracy, Abatemarco, and Karp.

## V. Conclusion

The Court **RECOMMENDS** that the District Court **GRANT in part** and **DENY in part** the Motion to Dismiss [# 31]. The Court **RECOMMENDS** that the District Court **GRANT** the Motion to Dismiss as to Defendants Tracy, Abatemarco, and Karp, as well as the ILSA counterclaims and the negligent misrepresentation counterclaim as to all Defendants. The Court **RECOMMENDS** that the District Court **DENY** the motion to dismiss as to the fraud and unfair and deceptive trade practices counterclaims.